# THE BALTIMORE, CHESAPEAKE & ATLANTIC RAILWAY COMPANY, A CORPORATION, *vs.* LILLY M. MOON.

*Steamboat companies: negligence; injuries to passengers; open and unguarded stairways. Evidence: experts; competency; discretion of Court. Prayers: no evidence to support—; contributory negligence. Pleading: order of proof.*

In a suit by a passenger against a steamboat company, for damages for injuries received in falling down a stairway, on one of the defendant's boats, the declaration alleged, that on a crowded boat, during a rain storm, the plaintiff was endeavoring to pass from one part of the boat to another; the curtains and awnings were all down, and it was very dark; two employees of the boat carrying a large ice-cream freezer were endeavoring at the same time to pass through the crowd; on their calling out to make room, the plaintiff stepped back, and, pushed by the crowd, fell down a staircase to a lower deck; the doorway leading thereto had been left open and unguarded and in the darkness the plaintiff mistook it for a passage way: *Held that,* under the facts of the case a prayer of the defendant taking the case from the consideration of the jury was properly rejected, as the plaintiff could not be considered guilty of contributory negligence.
                                                              p. 388

To justify a Court in saying as a matter of law, that conduct is *per se* contributory negligence, the case must present some such feature of recklessness as could afford in the minds of ordinary men no opportunity for difference of opinion as to its imprudence.                                         p. 389

A prayer asking that the jury be instructed that if "the plaintiff was lame and suffering from a nervous trouble, etc., etc., and that she would not have fallen down the said steps and been injured if she used due care and caution, *having regard*

*for her disabilities* (if the jury so find), their verdict must be for the defendant.", is improper, where there was no evidence to show that the lameness of the plaintiff, etc., in anywise contributed to the accident.                          p. 390

A prayer asking that the jury be instructed that in awarding damages, no allowance should be made for the plaintiff's state of bad health, "should the jury find that the plaintiff's present state of health was due to the unskillful or improper medical treatment on the part of her attending physician," is improper where there was no evidence that her condition was due to any such improper or unskillful treatment.  p. 390

Instructions to the jury are improper which are based upon a theory of which there is no legally sufficient evidence.  p. 390

Where in an action against a steamboat company for damages received by a passenger in falling down a stairway through a door which had been left open or unguarded at the time, and where under the circumstances attending the accident the proper construction of the boat was not in question, *it was held,* that expert testimony as to the propriety of the door being in that location was not admissible.         p. 391

Where a question for the jury's determination, is such that after a full consideration of all the facts the jury is fully capable of deciding it, without the aid of experts, the evidence of an expert witness is not admissible.                          p. 392

The competency of an expert is a preliminary question resting in the discretion of the Court, and unless founded on some error of law or on serious mistake or abuse of discretion, its ruling is not reviewable.                          p. 392

In general it is for the plaintiff to begin the case, and he must put in the whole of his evidence upon any point at issue that he opens; the defendant then puts in evidence his entire case; and in reply the plaintiff is limited to such new points and questions as may have been first opened by the defendant's evidence.                          p. 393

But in general the question as to the mere order of proof, and under what circumstances the evidence should be admitted or

rejected when offered out of the proper order must rest, in the absence of some positive rule of Court upon the subject, in the discretion of the Court directing the trial; and, in general, from its rulings on such question no appeal will lie.

p. 393

*Decided June 13th, 1912.*

Appeal from the Baltimore City Court (DAWKINS, J.), where a judgment and verdict for $700.00 had been rendered against the defendant.

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Ralph Robinson,* for the appellant.

*Daniel B. Chambers* and *George T. Mister,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of the appellee against the appellant for injuries alleged to have been sustained by her in falling a distance of ten or more feet through a doorway into the hold of the steamer of the defendant, she alleging in the *narr.* that "her injuries (thus sustained) were the direct result of the negligence of the defendant, its agents and servants, in not properly guarding, protecting, lighting or warning the plaintiff of said dangerous doorway."

Eleven exceptions were taken to the ruling of the Court on the admissibility of evidence, and the twelfth embraces the ruling on the prayers. The Court granted the four prayers offered by the plaintiff and the second and fourth prayers of the defendant, but rejected the other prayers of the defendant. The defendant excepted to the granting of the plaintiff's prayers and to the rejection of its first, third, fifth, sixth and seventh prayers.

BALT., CHES. & ATL. RY. CO. vs. MOON.    383

Md.]                    Opinion of the Court.

We will first consider the ruling of the Court upon the prayers. In the first prayer of the defendant, which was refused by the Court, it was asked to instruct the jury that there was no legally sufficient evidence under the pleadings to entitle the plaintiff to recover, and it is in the discussion of this ruling of the Court that the defendant has devoted much of his brief. Thus it will be necessary for us to review the evidence in determining whether or not the learned Court below acted properly in refusing this prayer.

By the evidence offered by the plaintiff, she on the fifth day of August, 1911, after purchasing from the defendant company a round-trip ticket from Baltimore to Claiborne, took passage with her husband and several relatives and friends on the defendant's steamer "Cambridge," which left Baltimore at about three o'clock P. M. on that day. About four o'clock in the afternoon while the party, including the plaintiff, was upon the hurricane deck of the steamer, a storm arose and they were driven by the rain to seek shelter in the enclosed parts of the steamer. They first went to the saloon deck, the deck immediately below the hurricane deck; but, finding the saloon packed with people and no room for them, they attempted to reach the next deck below, which is the first deck of the steamer, known as the main or freight deck, by way of the after stairway, which emptied into what is known as the Social Hall, but their way was blocked by the crowd, and thus they went to the deck below by way of the forward stairway. Upon reaching this lower deck they proceeded aft, on the port side of the boat, to the Social Hall, entered and found it much crowded.

This Social Hall is immediately forward of the dining saloon and for a distance of about five feet forward therefrom it extends across the entire width of the boat, but from that point forward as far as it extends, about eleven feet, it is divided by the enclosed after stairway, about eight and one-half feet in width, that leads to the saloon above. The distance on each side of the stairway to the side of the boat is about twelve feet. On the starboard side, next to the stair-

way, is the purser's office, consuming about four and one-half feet of such space; the balance of it is in the Social Hall.   On the port side of the stairway the whole space of about twelve feet is in the Social Hall.

On each side of the boat in the said hall is a gangway, six feet four inches in width, the height not given, and two windows, two feet wide and two feet six inches high.   There are also windows in the partition between the dining saloon and this hall, and two doors with glass in the upper panels, one on each side of the boat, leading out of this hall on the quarter deck.   At the time of the accident the gangway was closed to shut out the rain and therefore admitted no light. The dining saloon is lighted with a number of windows; these windows have blinds "that go up and down."   There is no proof as to the position of these blinds or any of them— that is, whether they were up or down or partially closed. We mention this fact because the amount of light admitted through the windows in the partition separating the dining saloon from the Social Hall was dependent upon the extent of the light in the dining saloon.

Samuel McBride, who at the time of the accident was seated in the Social Hall five or six feet from the door where the plaintiff entered, and not more than ten feet from the doorway through which she fell, testified that there was just about as many people in that part of the boat at that particular time (meaning the time of the accident) as could get there.   That it was raining very hard; it was a dark, stormy afternoon; that the only light to be had was what came through the window leading from the open space in front of the stairway to the dining room, and, as he recalled, there was an opening in the side of the boat back of where he was seated.   "There is a gangway that is used to go off and come on the boat, but that was closed."

Other witnesses testified as to the same darkened condition of the hall.   One of them was Albert Boden, who stated that "it was pretty dark in the Social Hall; it was as dark out

of doors as it could be; the storm caused it to be dark, and there were no artificial lights in the Social Hall." That he did not see any openings at all; they were all closed in, so far as he knew.

The doorway through which the plaintiff fell is located on the port side of the enclosed stairway in the forward end of the partition separating it from the Social Hall. From it a stairway of ten or twelve steps leads in the hold of the steamer. The plaintiff, as we have said, reached the main or freight deck from the saloon above by way of the forward stairway. She, accompanied by her friends, or at least some of them, proceeded aft on the port side of the steamer, and upon reaching the Social Hall entered through a door in a partition separating said hall from the forward part of the boat. This door is located at a distance of not more than five feet from the doorway through which the plaintiff fell. She found the hall crowded with persons, and many satchels and suit cases were in the hall. After entering she momentarily stopped at or near the door where she had entered, and in this position the doorway that we have mentioned, through which she afterwards fell, was immediately to her left and only a few feet from her. In her evidence she says "It was awfully crowded, and as I have said before, it was awfully dark, as they had the side of the boat down, and these men with this freezer hollored 'heads up' and the crowd pushed and as they pushed they turned me and as I was turning they were pushing me with such force that I took the opening (the open doorway) to be a passageway and in turning I stepped in there, and oh, my, I went all the way down."

The men with the freezer, as she spoke of it, were those employed by the company who were taking this freezer from the forward part of the boat through the Social Hall out upon the quarter-deck to serve its contents through the window of the dining saloon to the passengers who were then at dinner. The vessel containing the ice-cream, called in the evidence the container, when pushed through the crowd, caused the persons on each side to press back against those

behind them. The position of the plaintiff was between them
and the open stairway, and she says, "I stepped in there
because they were pushing me and in pushing me, as I said
before, they turned me and they kept pushing and I saw
this and I stepped right in, thinking it was a passage way
to the other side of the boat. That is the whole thing of it,
they kept pushing me and there was nothing else to do."
That when she fell she was unconscious for a time. After
the fall she was taken up-stairs and after a short wait was
put in one of the rooms of the boat.

She testified that her knee was hurt, she could not kneel
at all; her limbs and back were bruised, and that she still
suffers with her back. "That she was in bed over a week
constantly after the accident, and then she would sit up
and lie down again for two or three weeks; that it was
six weeks before she was able to get around much at all, and
that she still suffers with her back and her nerves and
sleeps very bad. That before the accident she slept very
nicely, and had no trouble at all; that now sometimes she
does not sleep may be; well, she will doze off, wake up and
doze off again, and if it were counted up it would not be two
or three hours in a night that she sleeps." That before the
accident she did all her household work; that now she has
to have someone to help her. She was then asked if she had
any nervous trouble before this accident, to which she replied,
"Last May I lost my appetite and I was a little run down,
and Mr. Moon called the doctor in." "That at the time
she took the trip down the Bay she was getting along fine.
They thought it would benefit her to take the trip, she was
improving so they thought the air would benefit her." She
admitted that Dr. Henning was treating her for nervous
trouble at the time of the accident, but said "they were not
in a bad way, that she was much improved." She stated she
had been lame for a long time, all her life, but it had noth-
ing to do with the accident, that it did not affect her locomo-
tion or walking. Upon cross-examination, she was asked,
"You were being pushed and you took it to be a passage-

way and you stepped in there?" To which she replied, "I did not have anything else to do, because they were pushing me, and if I had not stepped in there I would have gone down anyhow."

The witness McBride testified that he was seated with three or four others in chairs in the position explained above, and when the men came through the crowd with the ice-cream freezer, they ran into one of these gentlemen and knocked him out of the chair, and the people generally were pushed in every direction to make room for the large ice-cream freezer that was practically the size of a flour barrel, with three men attached to it. That the crowd divided and made a passage way for these men with the ice-cream freezer to pass through, and it was at this time that he heard the noise and heard the scream. That immediately after the accident he examined the doorway through which the plaintiff had fallen, and found the door hooked back; that the door opened from the right-hand side and hooked back against the partition; that it was about two feet in width and fastened back with a hook, and from general observation, the door, when fastened back, appeared to be the same color as the partition. On this point another witness testified that the door, when fastened back, was the same color as the partition, an oak color.

The testimony disclosed that a stairway runs down from this doorway, which partially turned at a point several steps from the bottom, the distance down being ten or twelve steps. That inside of the doorway it was dark, no light at all. So far as is disclosed by the evidence, the only way of lighting this stairway, without the use of artificial light, was by means of a small window, opposite the doorway, in the partition separating the purser's office from the enclosed stairway, and the evidence discloses that there was no artificial light in the purser's office. This stairway led into an apartment that was used as a dining-room for the officers, and at the time one or more of them were eating their dinner, which was brought to them by a waiter from the pantry in

the rear of the dining saloon.   In carrying it to them, the waiter went from the pantry to the quarter-deck, then from the quarter-deck through the Social Hall, through this doorway and down the steps to the dining-room below.   It is said by the defendant that this door was opened and hooked back during the time that the officers were at their meals, so as to avoid the necessity of opening and closing it each time the waiter went to and returned from said dining-room below.

The evidence further discloses that at the time of the accident there was no rail or guard placed across the doorway, nor was there any person there to warn and protect passengers of the danger incident thereto.

It was also disclosed by the evidence that the number of passengers that this steamer was permitted to carry by the Federal Government was eight hundred; on this occasion there were seven hundred and twenty-one passengers.   These passengers, during the rain, were, of course, required to seek shelter in the enclosed parts of the boat, and we can assume that such parts were more or less crowded as the result thereof.

There were a number of witnesses who corroborated the testimony given as to the condition of the Social Hall in respect to light at the time of this accident, also as to the unguarded and unprotected condition of this doorway and the darkness of the space within the doorway, which we deem unnecessary to relate.   With this evidence before the jury tending to show the negligence of the defendant company in permitting this door to remain open at such time, under the conditions and circumstances related, with no protection or warning to passengers, including the plaintiff, against the danger incident thereto, we think the Court properly ruled in refusing to grant the defendant's first prayer, which asked that the jury be instructed that there was no legally sufficient evidence to entitle the plaintiff to recover.

The defendant contends that this instruction should have been granted because of the contributory negligence of the plaintiff, and in support of its contention calls our attention to the principles of law laid down by this Court in the case of the *B. & O. R. R. Co.* v. *Wiley,* 72 Md. 40, "That to justify a Court in saying that conduct is *per se* contributory negligence, the case must present some such feature of recklessness as could leave no opportunity for difference of opinion as to its imprudence in the minds of ordinary prudent men."

If this prayer is a proper one under which the defendant company can ask that the case be taken from the jury by reason of contributory negligence on the part of the plaintiff, we, governed and controlled by the principle of law above laid down, still think the Court committed no error in refusing to grant it, for in our opinion the act of the plaintiff in stepping into the doorway, under the conditions and circumstances related, cannot be regarded as such an act of "recklessness as could leave no opportunity for difference of opinion as to its imprudence in the minds of ordinarily prudent men." The situation in which she was placed, the excitement incident to the call of those moving the freezer "heads up" or clear the way, the fact that she was being pressed in the direction of this open doorway by the crowd, which she seemed to be unable to resist, and the necessity for immediate action without time to deliberate, all should be considered by the jury for their determination whether or not she acted as a reasonably prudent person under such conditions and circumstances. *Baltimore and Potomac R. R. Co.* v. *Jean,* 98 Md. 546.

The exceptions to the third and fifth prayers were waived. Thus we come to the exception to the sixth prayer. We think the Court committed no error in refusing to grant this prayer. The Court was asked to instruct the jury, if they should find that the "plaintiff was lame and suffering from a nervous trouble * * * and that she stepped through a doorway * * * to avoid jostling of the passengers on the

main deck and fell down said steps and was injured, and
that she would not have fallen down said steps and been
injured if she had used due care and caution in stepping in
said doorway, *having regard for her disabilities* (if the jury
so find), their verdict must be for the defendant."

As to this prayer it is sufficient to say, without further
discussion of it, that there is no evidence whatever going
to show that the lameness of the plaintiff or her other
alleged disabilities in anywise contributed to the accident.
All that was said about her lameness is found in her own
testimony, where she says that such lameness did not in
any wise affect her locomotion or walking, and had nothing
to do with the accident.

By the seventh prayer the Court is asked to instruct the
jury that in awarding damages no allowance should be made
for the plaintiff's present state of bad health "should the
jury find that the plaintiff's present state of bad health is
due to the unskillful or improper medical treatment on the
part of her attending physician."

There is no evidence that her present state of bad health
is due to the unskillful or improper medical treatment on the
part of her attending physician.   Dr. Chambers testified
that from the testimony of Dr. Henning he thought Dr. Hen-
ning did not know what was the matter with her previous to
August 5th, 1911; after that time, however, he thought
that Dr. Henning "had a fairly good grasp of the situation."
That at that time he thought she was suffering from neuras-
thenia or nervous prostration, and in his treatment was giv-
ing her good food, sedatives for her nervous condition and
stimulating tonics.   He did not speak either favorably or
unfavorably of his treatment of her prior to that time.

Whatever may have been Dr. Chambers' opinion as to Dr.
Henning's knowledge of the trouble with which his patient
was suffering prior to August 5th, 1911, there is no evidence
that his treatment of her during that time was at all inju-
rious or harmful to her health; on the contrary, we have the

BALT., CHES. & ATL. RY. CO. vs. MOON.  391

Md.] ·                    Opinion of the Court.

testimony of several of the witnesses, the plaintiff, Dr. Henning and others, that she had materially improved under the treatment of Dr. Henning up to the day of the accident. The plaintiff testified that before the accident she "slept very nicely and had had no trouble at all; that at the time she took the trip down the bay she was getting along fine; that she was improving so they thought the air would benefit her." We think the Court committed no error in refusing this prayer.

The 1st, 2nd, 3rd, 4th, 5th and 11th exceptions may be considered together. These exceptions present the question as to the admissibility of the expert testimony of a local steamboat inspector who had in June, 1911, and in February, 1912, inspected the steamer "Cambridge," and who was familiar with the stairway leading from the doorway through which the plaintiff fell, and the testimony of Alexander H. Sets, Assistant General Manager of the defendant company, as to the question of negligence on the part of the company in leaving the passageway open, with the door fastened back, as it was on the day of the accident. We have no difficulty in reaching the conclusion that the Court below properly passed upon the admissibility of this testimony. The negligence complained of is not in the construction of the boat in the sense that the door should not have been there, nor in the appliances with which the boat should be furnished, but it is in the use of the door in permitting it at such times and under such circumstances as have been detailed in this case, to remain open without proper protection or warning to the passengers of the danger incident thereto. It was proper, of course, that the door should be opened and the doorway used as a means of ingress and egress to and from the apartment below, and at times, under different conditions and circumstances, the leaving of the door open might not have been negligence on the part of the defendant, but the question here to be determined is, was it negligence for the company at the time of the accident and under the conditions and cir-

cumstances as then existed, to permit the door to remain open, unguarded and without protection or warning to the passengers of the danger incident thereto.   This was a question for the jury to determine after a full consideration of all the facts and circumstances of the case, and which we think it was fully capable of determining without the aid of expert testimony.

The question asked Dr. Henning by defendant's counsel, which was not permitted to be answered by the Court, was subsequently answered by the same witness without objection.

The seventh exception is waived by the defendant.

The seventh and one-half, eighth, ninth and tenth exceptions were taken in connection with the testimony of the witness, Dr. Albert T. Chambers.   The first of these goes to his qualifications as an expert witness on nervous troubles. The doctor testified that he had had fourteen years' experience as a general practitioner, and had a year's teaching under Prof. Miles, an eminent specialist on nervous troubles; that in his general practice he had many cases of purely nervous disease and had much experience and knowledge as to this particluar disease, neurasthenia.

"The competency of the expert is a preliminary question resting in the discretion of the Court, and unless founded on some error of law or on serious mistake or abuse of discretion, this ruling is not reversible." *Jones on Evidence,* sec. 369.   In this case we think the learned Judge below committed no error in determining the question of the witness's qualification, but if he had, it is clearly not a reversible error.

The question raised under the eighth exception is objected to because not properly in rebuttal.   After the close of the plaintiff's case several witnesses were placed upon the stand by the defendant to give expert testimony in relation to the trouble or disease with which the plaintiff was suffering.   At the conclusion of the defendant's testimony, Dr. Chambers was offered by the plaintiff and was asked whether or not,

in his opinion, the plaintiff was suffering from neurasthenia at that time. Dr. Henning had previously testified on behalf of the plaintiff in relation to her troubles, and it is the contention of the defendant that this line of examination should have been exhaused by the plaintiff before he closed his case.

"According to the well established practice, the plaintiff, having the right to begin, must put in the whole of his evidence upon every point or issue which he opens, and the defendant then puts in evidence his entire case; and in reply the plaintiff is limited to such new points and questions as may be first opened by the defendant's evidence. 1 *Greenleaf, Ev.* 469a (12th ed.) From this general rule there may be a departure to meet the requirements of each particular case; but the entire question, as to the mere order of proof, and under what circumstances evidence should be admitted or rejected when offered out of the proper order, in the absence of some positive rule of Court upon the subject, must be allowed to rest in the discretion of the Court directing the trial, as the tribunal best qualified to judge what the justice of the case may require in these respects; and hence from the ruling on such questions no appeal will lie." *Bannon* v. *Warfield*, 42 Md. 39. The admission of this testimony when offered was in the discretion of the trial Judge and no appeal lies from his ruling thereon.

As to the ninth exception, the question there asked the witness, which he was not permitted to answer, was later answered by the witness without objection.

We think the Court committed no error in its ruling on the tenth exception in not permitting the question to be answered.

The judgment of the learned Court below will be affirmed.

*Judgment affirmed, with costs to the appellee.*