# MAYOR AND CITY COUNCIL OF CUMBERLAND
## *v.* MILTON TURNEY

[No. 44, October Term, 1939.]

298

*Decided November 29th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Charles Z. Heskett* and *Harry I. Stegmaier,* for the appellant.

*Lewis M. Wilson,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This appeal is from a judgment for the plaintiff in an action brought by Milton Turney, by his father and next friend, against the Mayor and City Council of Cumberland, to recover damages for injuries received in an automobile accident which occurred on November 6th, 1938, on Washington Street in that City.

There was in the case evidence tending to prove these facts: Washington Street is a public highway of the City of Cumberland, running in a general easterly and westerly direction. It begins at Greene Street and runs west at varying grades over Fechtig's Hill. In its course it intersects Semmes Avenue near the 700 block, and from that intersection continues west over Washington Street Hill. Running northwest from that intersection, beginning at about 120 feet therefrom, its direction changes abruptly from northwest to southwest in a curve subtending an angle of 57 degrees 45 minutes on a radius of 78.8 feet. Proceeding west from Semmes Avenue and through the curve the grade ascends at an angle of 9 degrees following the natural contour of the land.

The width of the street varies, east from a point near the scene of the accident it is 60 feet, west of that point it is 50 feet, but the width of the driveway is uniformly 30 feet, so that the difference in width is in the sidewalks, which are laid out with grass plot and are paved and guttered.

That part of it under consideration here was first improved under an ordinance of the Mayor and City Council of Cumberland, passed in 1916, which provides "That said part of said Washington Street shall be paved in such manner and under such principle, and with such kind and quality of paving material, and with such preparation as to grade of the street and materials for the bed of the same as the Commissioner of Streets and Public Property and the City Engineer may elect." The driveway was originally paved with concrete, but under an ordinance of 1935 it was resurfaced with an asphalt concrete, referred to in the evidence as "blacktop."

The elevation of the crown of the road above the edges at the curb varies from six or seven to nine or ten inches, so that the roadway slopes laterally from the center to the sides in the ratio of from one-half to two-thirds of an inch to the foot.

About 200 feet east of Semmes Avenue there was a 250 candle power electric light, and from that point west

for about 700 feet the center of the roadway was marked by a 6-inch yellow line, which for a short distance on either side of the curve was wavy or undulating. About 60 feet west of the light the word "Slo" is painted on the surface of the road in letters 9 feet high, about 60 feet west of that sign on the north side of the road there is a sign bearing the legend "Slow-Danger," the word "Slow" in red reflector letters on a black background and the word "Danger" in $3\frac{1}{2}$ inch black letters on a white background, at Semmes Avenue and also at a point west of that, and about 50 feet east of the curve, there are other "Slo" signs similar to the first painted on the road, and at the apex of the curve there is a roadside sign on which appears the word "Slow" in crystal reflector letters $6\frac{1}{2}$ inches high on a black background, and at that point too there is a 250 candle power electric light. On the north side of the street opposite the west side of the curve are two brick houses separated by a garage, one occupied by Robert Yancey, designated as 711 Washington Street, the other, just east of that and designated as 709 Washington Street, is occupied by Clarence Lippel. About 30 feet west of Yancey's house a pole stood at the edge of the north curb.

On the night of the accident Milton Turney, nineteen years old, and employed as an assistant mail messenger, left his father's home in Oakland, where he lived, in a friend's automobile, to accompany the friend, Stanley Stark, on a visit to the latter's aunt, who lived in Cumberland.

They left Oakland at 12 or 12.30 o'clock at night and, after driving rather aimlessly about, arrived at Cumberland at about 3 o'clock in the morning, and went to the place where the aunt had formerly lived, but found that she had moved, and then drove about the city in a somewhat desultory search for her home, and at about 5.30 o'clock in the morning were driving west on Washington Street at the 700 block. At that time it was quite dark and the street lights were burning. In passing the curve the automobile skidded or side slipped and crashed into

the pole west of the Yancey home. As a result of the collision the car was wrecked, and Turney and Stark severely injured.

Stark, who was driving the car, said that at the time of the accident he was driving very slowly on the extreme right side of the road, right next to the curb, that he did see one small sign on which was the word "Slo" but but he saw no other signs, except the wavy line in the middle of the road. When asked to tell how the accident occurred, he said: "Well, we came suddenly on the curve and turned sharp to the left; and the car—something pulled the car strongly to the right, and it ran up over the curb, and the wheels were up over the curb on the right side and in between the walk and the curb, and crashed into the telephone pole. Ran right along the side of the curb, right before we got to the pole * * *."

Turney said that just prior to the accident he was "just sitting there talking to Stanley" and that "as we were approaching this curve, the car, after it got on the curve, it seemed that there was a slant there, and somehow or other, this slant seemed to—don't know—take the car and push it up on the curb. That is the way it was to me. Pushed it up on the curb and just deliberately pushed it on into that telephone pole." He saw the sign which had "Slo-Danger" on it and "that snake in the middle of the road" which got him "confused," but saw no other signs. The car was apparently in high gear at the time of the accident.

Alec G. Shaner, a defendant's witness, said that the automobile was "completely demolished," that it was a "complete wreck," and that it had been "junked," and Stark said that he ordered no repairs for the car, that so far as he knew his mother had ordered none, and it is apparent from his testimony that he never saw it nor inquired about it after the accident.

The weather at the time of the accident was clear, the middle of the road was dry, but the sides were moist from the dew.

Robert Yancey, who lived at 711 Washington Street, said that at the time of the accident the road at that point was surfaced with black top of fine texture and when wet was "extremely slippery," that in driving over it your "wheels will spin and it is hard to get hold of them." He considered the road at that point unsafe "because there were no markers to show strangers which way that curve went, and the condition itself is bad enough for drivers who know the street. The center line in the center of the street was very, very dim." He had an idea that the grease and oil from passing automobiles made it slippery, but added that that was "no more than customary traffic puts on it."

Clarence Lippel, who lived next door to Yancey, said that the curve was sharp, that the road surface was slippery "as glass" when wet, that there had been more than a dozen accidents there within the year, and that the road at that point was dangerous, and he added that accidents happened "every week, practically, sometimes several a week." He admitted however that there was at times a "continuous stream of traffic" at that point and at other times very little, if any.

Herbert A. Dye, who was also familiar with the street at the place of the accident, said that the curve was dangerous because it was "sharp, because it is slick—several reasons why it is," but on cross examination he gave this testimony: "Q. If this curve was as dangerous as you want the jury to believe, how come you always used this street? A. I thought I had it licked. I always was very careful. Q. You drove around there many hundreds of times and didn't have a wreck? A. Yes. I was an expert on the curve. Took great pains to go around it right. * * * Q. Then you got around several hundred times and had no accident? A. Yes. Q. Would your opinion be affected by the number of times you got around there safely? A. Not at all. Q. The fact you went around there hundreds of times safely would not lead you to believe it could be driven safely? A. You can creep over a dangerous spot when you know it is there."

304

There also was offered in evidence a letter from residents who travelled over the street more or less frequently, addressed to the corporation, calling its attention to the dangerous condition of the road, and asking that it be remedied.

The evidence submitted on behalf of the defendant related almost exclusively to the construction, surfacing, and lighting of the road, and the adequacy of the warning signs thereon. Ralph L. Rizer, the city engineer of Cumberland, and an engineer who had specialized in road construction, said that black top was generally known among engineers as practically non-skid material, that actually there was no such thing as an absolutely non-skid material, although the black top was safer than the old concrete surface. He said too that there were no structural defects in the 700 block of Washington Street, and that it was designed for a speed of fifteen miles per hour, and that for cars driven under a certain speed the curve was as safe as the straight road, but not at higher speeds, and that the road at that point was sufficiently lighted to permit careful drivers to traverse it in safety. After stating that black top was as near a non-skid material as there was "on the market," he testified: "Wouldn't it be possible for—with your engineering knowledge—for you to go up on Washington Street—and you call it 'scarifying,' but I will call it 'making the street less smooth, purposely and intentionally.' Wouldn't that be possible for you, with your knowledge? A. It would be possible to scarify that street, but it is not being done in this city. Q. From your experience as city engineer and your experience in laying and grading that street, do you think it would be an engineering mistake to elevate the northern part of the curve as you round it? A. I think it would be very bad practice and is not being done in cities. Q. You think it would be less dangerous if that curve were elevated on its northern side? A. It would probably encourage speeding and endanger the value of the properties. Q. You haven't answered it. Do you think it would be less dangerous

or more dangerous? A. I think it would make it no safer to the man who would drive his car within the speed limits required."

Philip J. Arendes, construction engineer, who lived on Washington Street near Semmes Avenue, said that the construction of Washington Street conformed to the standard engineering practice for cities, and that the black top surfacing material is recognized by engineering authorities as a non-skid type of pavement, and that he never heard of banking curves in city limits. Asked whether the curve should be improved he said: "It could be improved, but, as I said before, you can get cars around there at one hundred miles an hour, but is that improvement there?"

Alvin H. Wilson, a construction engineer, said that the construction of the street was in conformity with standard practice. Asked if it would be good engineering to lower the south side of the street bed, he said that it would be for high speed traffic, and then testified: "Would it be bad engineering practice for low speed traffic? A. In an area that has already been developed, usually it involves some property damage. If the curve in the first place was designed as a safe course for the speed limit it was to be used for, and if that is true, there wouldn't be any particular necessity in elevating one side of the curve. Q. You heard the testimony, and heard that there have been a great many accidents at that curve? A. Yes. Q. Don't you think as an engineer you could change the plan of the curve and relocate it or reconstruct it so as to make it much safer? A. Yes, I think it would be possible. * * * Q. Safer for what? A. For high speed traffic. * * * Q. Wouldn't it be safer for moderate speed traffic? A. I don't think it would be. I can't see any reason why it would be."

Leander Schaidt, a former city engineer, also said that the street construction at that point conformed to sound practice, as did Leo T. Downey, district engineer of the State Roads Commission. On cross examination Downey said that scarifying or disking the surface of slippery

roads was a recognized engineering practice until the surface could be chipped and oiled, but that it was not customary to oil or chip specification C, and that black top had been put on "the real slick" roads in an effort to "non-skid" them and it had been successful. He also gave this testimony: "What is the purpose of banking curves in the open country? A. To give persons a chance to get around there at a high rate of speed. * * * Q. It also helps them to get around there at a low rate of speed, doesn't it? A. It would depend upon the bank. If you get too much bank, you might have a sideways slip. Q. If you bank it as steep as the motorcycle ride in a carnival, you might fall down off it? A. You sure would. * * * Q. Do you know of any engineering practice which recommends the banking of a curve in a residential district? A. In cities? I don't know as I do."

There was an offer to show that a traffic test, over a period which included days when there was rain and snow, showed that an average of 600 cars a day passed the curve without accident. That offer was refused, but Oscar A. Eyerman, chief of police of Cumberland, was permitted to testify that he had driven around the curve safely many times at times as fast as 30 or 32 miles an hour.

There was evidence that a "dummy traffic officer," carrying warning signs, which was usually in the middle of the street east of the curve, was missing on the night of the accident.

There was no evidence or suggestion that either Turney or Stark had been drinking, and both were licensed and experienced drivers. It was also shown without contradiction that at the time of the accident the surface of the street was smooth, flat, and without holes.

At the close of the whole case the plaintiff offered two prayers, which were granted, and the defendant one, a demurrer prayer, which was refused. Those rulings are the subject of the fourteenth and the most important exception submitted by the record.

The issue to be first considered is whether the facts recited above are sufficient in law to support a finding that defendant was guilty of primary negligence.

The appellant charges negligence in eleven particulars, most of which may first be reduced to three categories, and eventually to one. The first is that the street was not properly planned or designed, the second that it was not properly lighted, and the third that it was not properly "signed."

Those specifications include two items not within those categories, but they are of little importance, one is that the city permitted "oil and foreign substances" to remain on the street bed, the other that it failed to maintain the "dummy officer" in its place at the time of the accident. There is not the slightest evidence in the case that there was any accumulation of oil or other "foreign substance" on the street bed greater or different from that found on any street over which there is much automobile traffic, and since Stark had to pass five other warning signs before he passed the curve, even if it could be held that the city was bound to maintain such a sign, it could have given him no more information than he should have had from the five signs which were there.

The design and the lighting of the street, as well as placing on it signs warning the travelling public of any latent danger which travellers on it might encounter, were all matters committed to the judgment and discretion of the administrative officers of the corporation, and the real question in the case is whether the municipality must respond in damages for their errors of judgment.

The principle that a municipality, which has been granted the means to do so, is under a duty to keep the public streets and highways, under its management and control, in a reasonably safe condition, is too firmly established in this state to require either argument or authority. *Baltimore v. State* 173 Md. 267, 195 A. 571; *Baltimore v. Eagers,* 167 Md. 128, 136, 173 A. 56. So, where injuries were caused by a limb of a tree falling in

a public road, *Baltimore v. Eagers, supra,* a hole in a sidewalk, *Baltimore v. Bassett,* 132 Md. 427, 104 A. 39, a trench in a pavement, *Burke v. Baltimore,* 127 Md. 554, 96 A. 693, a hole in a pavement, *Annapolis v. Stallings,* 125 Md. 343, 346, 93 A. 974, a girder in the center of the roadway on a bridge unlighted and unmarked, *Baltimore v. Thompson,* 171 Md. 460, 189 A. 822, ice on a sidewalk, *Baltimore v. Marriott,* 9 Md. 160, ice in a street, *Magaha v. Hagerstown,* 95 Md. 62, 51 A. 832, one bicycling on a sidewalk, *Hagerstown v. Klotz,* 93 Md. 437, 49 A. 836, a hole in a sidewalk, *Keen v. Have de Grace,* 93 Md. 34, 48 A. 444, a stump in a roadway, *Delmar v. Venables,* 125 Md. 471, 94 A. 89, the absence of a guard rail at the end of a dark street leading over a dock, *Biggs v. Baltimore,* 129 Md. 686, 99 A. 860, or material falling from an unguarded structure on a public street, *Hagerstown v. Crowl,* 128 Md. 556, 557, 97 A. 544, 546, liability of the municipality was predicated on a breach of that duty. But in *Hagerstown v. Crowl, supra,* there is an intimation that, although the municipality, where it is under a duty to act, will be subject to liability if it fails to act at all, or does act but acts negligently, it will not be liable if it does make an honest effort to perform its duty, but through some error in judgement fails to do all that it should have done, or does something which it is required to do in an inadequate or imperfect way. In that case the court said:

"The municipal duty of keeping the streets reasonably safe for public use could hardly be said to be properly fulfilled if elevated structures are permitted to be built along the thoroughfares without any provision being made for protecting persons, on the street from the risk of harm to which they may be exposed by the building operations. The possibilities of injury from such a source are sufficiently apparent to call for some regulative action on the part of the municipality in regard to such conditions, in order that it may be in a position to plead the full performance of its duty as against such a claim as the present." *Hagerstown v. Crowl,* 128 Md. 556, 559, 97 A. 544.

So, while a municipality has been held subject to liability if it makes no effort to perform a duty by exercising a power which the law has granted it to be used, or where, in the performance of the duty, it fails to exercise ordinary care to accomplish the purpose for which the power was given, as in *Havre de Grace v. Fletcher,* 112 Md. 562, 568, 77 A. 114, where beer kegs were piled on a sidewalk in such a way as to endanger travellers thereon, *Baltimore v. Beck,* 96 Md. 183, 53 A. 976, where a pile of bricks was left in a street without a light or other warning, *Cochrane v. Frostburg,* 81 Md. 54, 31 A. 703, where the city failed to pass an ordinance excluding cattle from the city streets, *Taylor v. Cumberland,* 64 Md. 68, 20 A. 1027, where the city failed to enforce an ordinance forbidding coasting on city streets, *Baltimore v. Pendleton,* 15 Md. 12, where a dangerous trench was left in a public street, *Calvert County v. Gibson,* 36 Md. 229, where a road was out of repair, *Baltimore County Commrs. v. Baker,* 44 Md. 1, where a bridge was out of repair, *Eyler v. County,* 49 Md. 257, where there was a defective bridge, and *Anne Arundel County v. Duckett,* 20 Md. 468, where a road was out of repair. In none of those cases did the court approve the principle that a municipality is subject to liability for injuries resulting from erroneous but honest exercise of the judgment and discretion reposed by the law in its administrative officials.

The statement so often repeated in the cases that it is the duty of the municipality to keep its public highways safe for travel is subject therefore to the qualification that the duty is discharged if the municipality exercises ordinary and reasonable care in its performance, for it is not an insurer of the safety of persons travelling thereon even though they are injured while in the exercise of ordinary care. *Baltimore v. Thompson, supra; Elliott on Roads and Streets,* sec. 793; *Birckhead v. Baltimore,* 174 Md. 32, 197 A. 615.

Nor must negligence be inferred from the mere fact that a road or street is unsafe, for danger may inhere

in, and be inseparable from, its location, and absolute safety cannot be attained except at a prohibitive or impracticable cost, as in the case of a road over a mountain, where of necessity the grades must be steep and the roadway narrow and winding, or in a road at the foot of cliffs or palisades where falling rocks, earth, or debris may endanger the traveller.

In such a case there may obviously be danger without negligence, so the question not unnaturally occurs as to just what are the limits of the discretion reposed in the administrative agencies of a municipal corporation, who are charged with the construction of a road or other public improvement which is inherently and unavoidably dangerous. Or, to put it in another way, if such officials secure the advice of specialists whose skill, experience, ability, and standing are generally recognized as qualifying them to give such advice, and it formulates plans based on such advice, and employs skilled and competent agencies to execute the plans, is the municipality liable if it turns out that safer or better plans might have been adopted, or that the adoption and execution of the plans involved an error of judgment?

On that question the authorities split. Random expressions here and there in the opinions of this court, as in *Hagerstown v. Crowl, supra; Baltimore v. Thompson, supra,* 171 Md. 460, 467, 189 A. 822; *Thillman v. Baltimore,* 111 Md. 131, 140, 73 A. 722; *Cumberland v. Willison,* 50 Md. 138; *Hitchins v. Frosburg,* 68 Md. 100, 11 A. 826, indicate a trend in favor of non-liability, and what seems to be the weight of authority elsewhere supports that view.

In *Elliott on Roads and Streets,* sec. 565, referring to the construction of drains and sewers, the author says: "It has often been said, in general terms, that a municipal corporation cannot be held liable for injuries resulting from errors or defects in the plan of a public work, and the Supreme Court of the United States has given at least a qualified sanction to this doctrine. The reasons urged in support of the doctrine are, that plan-

ning or adopting a plan of a public improvement is a matter of a quasi-judicial nature involving the exercise of judgment, and that the corporate authorities in so doing act as public officers rather than as agents of the city. We think, however, that the rule is too broadly stated in these cases, and that there are instances in which a city may be liable for injuries caused by defects in the plan of a street or sewer. It seems to us that a distinction should be drawn between those cases in which the defect in the plan arises from a mere error of judgment and those in which the defect arises from negligence in devising or adopting the plan. * * * The only rule that has any solid support in principle is, that for errors in judgment in devising a plan there is no liability, but there is liability where the lack of care and skill in devising the plan is so great as to constitute negligence." And in section 566, he adds: "As we have seen, there is no liability for mere error of judgment, apart from negligence. If the city has obtained the professional advice of one skilled in such matters, and has used due care in selecting its adviser, it will generally be free from liability, if, in consequence of following such advice, the structure, or other improvement, as the case may be, turns out to be defective." See also sections 527, 596. Applying that principle to the improvement of highways, the same author says: "If the highway officers use reasonable prudence and care in selecting persons of skill to control and lay out the improvement, and take ordinary care to see that the persons that are so employed exercise skill and care, the public corporation will not be liable if it should turn out that the plan adopted was an unsuitable, defective, or improper one. If the officers take due care to obtain skillful advice and assistance the corporation they represent cannot be deemed guilty of negligence." Section 596.

In *McQuillen on Municipal Corporations* sec. 2804, it is said: "Late decisions support the general statement of earlier ones that a municipal corporation acts judicially when it selects a plan for some public improvement; but

as soon as it begins to carry out the plan it acts ministerially and is bound to see that the work is done in a safe manner. * * * In its governmental capacity the municipality may adopt a general plan of street improvement, and if an injury results from a danger inherent in the plan adopted, it is sometimes held there is no municipal liability. But if the danger has arisen from negligent construction and maintenance of the plan, the municipality is liable for resulting damages. * ·* * The law as to liability for defective plans for sewers is treated in later sections. Some of the decisions seem to hold, without qualification, that there is no liability for defects in plans. Immunity from liability is sometimes placed on the ground that municipalities are in the exercise of legislative power in the adoption of plans for local improvements, and sometimes on the ground that the exercise of the power to make local improvements is judicial or quasi judicial, and hence the municipality is not responsible for errors of judgment." See also section 2805.

In *Hitchins v. Frostburg,* 68 Md. 109, 11 A. 826, 829, the court said: "But, notwithstanding this duty and liability of the municipality in respect to powers delegated, there is a class of powers, defined as discretionary or quasi judicial, which the corporate authorities cannot be compelled to execute; as, for instance, the opening, widening, or extension of streets, the adoption of a particular grade, or the adoption of any particular plan for improvement, and the like, unless the terms of the statute are imperative. But any particular plan that may be adopted must be a reasonable one, and the manner of its execution thence becomes, with respect to the rights of the citizen, a mere ministerial duty; and for any negligence or unskillfulness in the execution or construction of the work, whereby injury is inflicted upon private right, the municipality will be held responsible. This is the principle maintained by the great preponderance of authority; and there is nothing in the case of *Cumberland v. Willison,* 50 Md. 138, at all opposed to

this principle, as it would seem to be supposed by counsel for the defendant. In that case, the authority delegated to the corporation to grade and improve its streets was held to have been properly exercised, with no want of reasonable care and skill. It was not attempted to be shown that the injury complained of had been produced by the want of care and skill in the grading and draining of the street; and there was no question of negligence or want of skill raised in the case."

In *Urquhart v. Ogdensburg.* 91 N. Y. 67, an early and still a leading case on the question, the plaintiff was injured by falling on an icy sloping sidewalk. The negligence alleged was that the slope was too steep. Disposing of that contention the court said: "The sidewalk in question was proved to have been strongly constructed and in good repair, and the allegation is that the plan upon which it was built was defective and dangerous; that it was too steep, and not that it was out of repair. It is very plain, the city could not be held liable for a defect or error in the plan, and it is, therefore, manifest that the court erred in refusing to nonsuit." In reaching that conclusion it relied to some extent on *Lansing v. Toolan,* 37 Mich. 152, which is inconsistent with later Michigan cases, decided after the adoption of a statute which imposed upon the municipality the duty of keeping its public highways "safe and convenient." See *Malloy v. Township of Walker,* 77 Mich. 448, 43 N. W. 1012; *McQuillen, Mun. Corp.* p. 1079. In *Monk v. Town of New Utrecht,* 104 N. Y. 552, 11 N. E. 268, 271, where a thirty degree slope which descended thirty feet from the edge of a sidewalk was left without a guard rail, it was held that "The commissioners were called upon, in constructing a plan, to decide upon the safety of the route adopted, and the dangers thereby to be encountered; and, if safeguards were necessary to protect travelers in passing dangerous places, to provide them, and, if they failed to do so, it constituted simply a defect in the plan of the work arising from an error in judgment as to its necessities. For such errors it is well settled that no lia

bility arises. *Urguhart v. Odgensburg*, 91 N. Y. 67, and 97 N: Y. 238."

In *Quest v. Town of Upton*, 36 Wyo. 1, 252 P. 506, 507, the court applied the rule that, in the absence of negligence, a municipality is not liable for injuries resulting from an error in judgment in the formulation and adoption of plans for street improvement, and cited in its discussion of the question these cases: "*Gould v. Topeka*, 32 Kan. 485, 4 P. 822; *Teager v. Flemingsburg*, 109 Ky. 746, 60 S. W. 718; *Owens v. Chicago*, 162 Ill. App. 196; *Healy v. Chicago*, 131 Ill. App. 183; *Morris v. Salt Lake City*, 35 Utah, 474, 101 P. 373; *Ward v. Salt Lake City*, 46 Utah, 616, 151 P. 905; *Watters v. Omaha*, 76 Neb. 855, 107 N. W. 1007, 110 N. W. 981; *Hoyt v. City of Danbury*, 69 Conn. 341, 37 A. 1051; *Conlon v. St. Paul*, 70 Minn. 216, 72 N. W. 1073; *Gower v. Madisonville*, 182 Ky. 89, 206 S. W. 27."

While there is no uniformity in the decisions on any phase of the question, it may be said that the better rule appears to be that a municipality is not liable for an injury resulting from an error of judgment, unaffected by negligence, in the formulation and adoption of plans for the construction or improvement of a highway, unless the condition which caused the injury is so obviously dangerous that there could be no room for difference in the minds of men of ordinary judgment and intelligence as to its dangerous character.

A corollary of that rule is that when the administrative officials, charged with the duty of making the improvement, employ competent and skilled experts to formulate plans therefor, and act upon their advice, the municipality is not subject to liability for any defect in the improvement caused solely by an error of judgment in their formulation, unless the defect is of such a character as to be apparent to any one of ordinary intelligence and judgment.

The converse of that rule would mean that in all cases where a traveller was injured through some supposed constructional defect in a highway, attributable to an

error in plan or design, that the propriety, adequacy, and sufficiency of the design would be decided not by competent and skilled engineers, but by a jury of untrained laymen. And since the administrative officials could not well call upon such a body to formulate the plans in the first place, there could be no standard or guide by which acts, done in the performance of their duty to formulate and adopt plans, could be tested to determine whether they constituted full performance.

The application of those principles may be illustrated by the facts of this case. One allegation of negligence by the plaintiff is that the road at the point of the accident was improperly graded and surfaced, in that the slope from the crown to the sides was too steep, and the surface too smooth. In connection with that it may be said that there is no sufficient or even intelligible explanation of the accident. The only eye witnesses, Turney and Stark, said that they were going very slowly when the accident occurred, Turney said at about twelve miles an hour, but that estimate was stricken out on motion. But there is no explanation of how a car driven at that speed up a nine per cent grade could ride over a five inch curb and strike a pole on a sidewalk with such force as to completely wreck it. It is apparent that the right wheels of the car ran for a greater or less distance along the sidewalk before the collision, but no effort was made to stop it.

Turney testified: "But after you got up on the curve and were running down the sidewalk, what efforts were made to stop it then? A. I don't know nothing about that. Q. You don't know what efforts were made? A. None that I could see of. Q. Did you know it was up and say 'look out'? A. No. Q. Why didn't you? A. We had been talking and wasn't watching for nothing like that, and wasn't expecting nothing like that. Q. You weren't expecting anything to happen, but, when it did, did you keep on talking to him and say nothing about being on the curb? A. I saw what was going to happen, and it so stunned me that I was speechless."

Stark said: "How far past that 'Slo' sign you did see, would you say you got in the car when the car jumped up on the curb and started to ride the driveway and the walk? A. About two hundred feet. Q. About two hundred feet west of that 'Slo' sign? A. West of it. Q That is where you jumped on the curb? A. Yes. Q. And you traveled from that point to where you hit the pole? A. Yes. Q. What efforts did you make to get off the walk? A. Well, it was done so quick I couldn't get off the side walk. There was a very strong pull to the right and it had me puzzled."

Nevertheless appellant's demurrer prayer concedes the truth of their statements, and it must be assumed, in considering the refusal of that prayer, that they were driving slowly and that the car did slip or skid sideways over the curb and was driven into the pole.

Apart from the testimony of several lay witnesses, Yancey, Lippel, and Dye, there was no testimony that except for the condition of its surface the road at that point was any more dangerous to travel than any road curving up grade around a hill would be, or that it was dangerous at all to automobile traffic if the drivers proceeded slowly and in the exercise of ordinary care.

Those witnesses were permitted to testify over the appellant's objection that the curve at that point was dangerous. They said it was dangerous because the curve was sharp, the road surface slick, and the crown of the roadbed high.

There is a line of cases such as *Baltimore & Yorktown Turnpike Road Co. v. Leonhardt,* 66 Md. 70, 5 A. 346; *Baltimore & Yorktown Turnpike Co. v. Crowther,* 63 Md. 558, 1 A. 279; *Everly v. Baker,* 168 Md. 599, 178 A. 691; *Baltimore & Liberty Turnpike Co. v. Cassell,* 66 Md. 419, 7 A. 805; *Lange v. Affleck,* 160 Md. 695, 700, 155 A. 150; *Cumberland & Westernport Transit Co. v. Metz,* 158 Md. 424, 149A 4, 565, which hold that, where the condition, qualities, or operation of some object, or the condition and appearance of some place, cannot be fully described, that witnesses may be permitted to give an opinion as

to the general effect of conditions which they observèd, but in this case the admission of that evidence was of doubtful propriety, in view of the fact that the appearance, condition, construction, and location of the road were fully described in the evidence, and that with that information the jury were quite as well qualified to pass upon its safety as the witnesses. *Jones on Evidence* sec. 359, 360; *Cecil Paper Co. v. Nesbitt,* 117 Md. 59, 69, 83 A. 254; *Baltimore, C. & A. R. Co. v. Moon,* 118 Md. 380, 391, 84 A. 536; 22 *C. J.* 253; 20 *Am. Jur., "Evidence,"* sec. 769 et seq. But appellant was not injured, because the fact that it was dangerous was not disputed.

But these witnesses did not say that the road was negligently dangerous, but it is implicit in their testimony that the danger was caused by the grade, by the descending slope from the crown to the edges of the road, and by the smoothness of its surface.

So the question finally is whether negligence may be inferred from those facts, and since the grade and the sharpness of the curve were determined by the contour of the land, those factors must be excluded from any consideration of the question. There remain the slope of the roadway from the center to the edges, and the nature of its surface.

Appellee's contention apparently is that negligence must be inferred from the fact that the road sloped from the center to the northern outer edge of the curve instead of being banked so as to ascend from the center to the northern edge, or from the south side to the northern edge. But the uncontradicted evidence in the case was that roadways in city streets are not banked, and that the elevation of the crown of Washington street at the curve conformed to standard engineering practice. So that, in constructing the road at that point, the municipal officials were confronted with two alternatives, one in constructing it in accordance with standard engineering practice adopted by skilled and competent engineers who specialized in the construction of streets and highways, the other, of departing from those standards

and constructing the road in accordance with the views of laymen. Certainly negligence should not be inferred from the fact that under those circumstances they elected to construct the road in conformity with the standard and accepted engineering practice, in the absence of any glaring and obvious increase in the danger, inseparable from the location, inherent in the plan. But there was no such obvious defect in the plan. Here too the uncontradicted evidence was that a crown is necessary for drainage, that a flat surface or a surface sloping down from the edges to the center, or unbrokenly from one side to the other, is undesirable in city streets, and that the crowned surface is safe for driving at certain speeds. In fact the only evidence that the curve as constructed is negligently unsafe is that afforded by the fact that accidents frequently occur there. But such evidence, while admissible (*Wise v. Ackerman,* 76 Md. 375, 391, 392, 25 A. 424), is, because of its collateral nature and the difficulty of inquiring into the causes of the other accidents, unsatisfactory (*Jones on Evidence,* sec. 163, 20 *Amer. Jur., "Evidence,"* sec. 304), where it is said: "Evidence of prior similar accidents, when admissible, is generally admissible for the following purposes only: (1) To show the existence of a defective or dangerous condition or appliance and the dangerous character of the place of injury or of the machine or the appliance, and (2) to show the defendant's notice or knowledge thereof. Such evidence is not admissible, according to the great weight of authority, for the purpose of showing negligence on the part of the defendant in using a machine or appliance, in permitting a dangerous condition to exist, or in doing such an act as he is charged with; it is not admissible to prove the cause of a specific occurrence, to establish a specific act of negligence, to establish the inherent danger in a particular condition or object, or to establish any collateral issue." 22 *C. J.* 253, 22 *C. J.* 753; *Annapolis & E. R. Co. v. Gantt,* 39 Md. 115. And it cannot be itself and without more evidence sufficient to establish negligence.

Safety and danger, when applied to a road or street, are relative terms, and their meaning is affected by such factors as speed and the direction of traffic over them. A steep curving road around or over a hill may be highly dangerous to a motor vehicle driven over it at a high speed without regard to the tendency of objects in motion to move in a straight line, but quite safe if the vehicle is driven slowly in a direction corresponding with that of the curve. The municipality is under no duty to make that absolutely safe which is inherently unsafe, where that would involve heavy and burdensome expense. But it is under a duty to use ordinary care to see that roads or streets under their management, which are opened and maintained as public highways, are reasonably safe for use by persons using ordinary and reasonable care.

Another assignment of negligence is that the surface of the street was too smooth. The surface was of a material known as Maryland State Specification C and similar to a patented product known as Amiesite, and the uncontradicted evidence was that it is as near skid-proof as any surfacing material can be. But there was evidence that that material varies in its composition and that some types are rougher than others. It is composed of crushed stone, dried and mixed with asphalt, and its texture becomes smoother from heat and age.

One witness said: "The age of the street, the number of years the black top itself has been put down, would vary the surface condition? A. It would close the texture. Q. So that as between many different streets paved with black top, the surface might vary greatly as to being slippery? A. Depending upon the age of the street, the age and year, yes."

Another said: "And the non-skid surface, just from my standpoint, one who is not skilled in those things, is a much rougher surface than the old black top? A. Well, some black tops, I would say, are perhaps more skid-proof than others. Q. But you can take one that is smooth, especially smooth, and without a great deal

of expense, you can put on a rougher surface, can't you? What do you call that, without disking it, what do you call that? A. It could possibly be done, I would think, maybe you could."

There was other testimony that the surface of the street was "smooth," that it was "glassy," that when it is damp "your wheels spin," and that it was "quite smooth and slippery" even when dry.

In the opinion of a majority of the court, that condition is not evidence of negligence, in view of the facts that the surfacing material was selected by experienced engineers as the most suitable material available for traffic at reasonable speeds over the road at that point by persons using ordinary care, and that at the time of the accident it was free from holes or other defects. That it was smooth and slippery when wet or damp was not evidence of negligence either, for that condition is as a matter of common knowledge ordinarily found in most streets and paved highways in good repair, and created no hazard to a traveller who proportioned his care to the conditions. Moreover, it is apparent from the testimony of the plaintiff and Stark that Stark was not exercising ordinary care under the circumstances. They were driving up a steep winding grade over an unfamiliar street, without paying any attention to where they were going. Turney said "We had been talking and wasn't watching for nothing like that, and wasn't expecting nothing like that." Stark did say that he looked where he was going, but he failed to see certain traffic signs which were there to be seen and plainly visible had he looked. He did not know whether the street was wet or dry, he said that he was not looking at the street, but was looking where "he was going," and he made no effort to reduce his speed or stop the car when it began to skid, and he too said that he had been talking to Turney just prior to the accident. That the smoothness of the street surface may have contributed to the accident is obvious, but it does not appear that the accident could have occurred had Stark used ordinary care to discover

the nature and character of the road over which he was driving. He said he was driving slowly, but that is a relative term, and there was no showing that he was driving within the speed limit prescribed for traffic over that part of the road.

In view of that conclusion, no discussion of the rulings on the admissibility of evidence is required, since it follows that the judgment must be reversed without a new trial.

*Judgment reversed, with costs, and without a new trial.*