909 A.2d 683

## MAYOR AND CITY COUNCIL OF BALTIMORE

v.

### Suzanne WHALEN.

**No. 101, Sept. Term, 2005.**

Court of Appeals of Maryland.

Oct. 19, 2006.

Justin J. King, Deputy Chief, Litigation (Ralph S. Tyler, City Solicitor, Baltimore City Department of Law, Baltimore), on brief, for petitioner.

Robert S. McCord, County Atty., Karen J. Kruger, Senior Asst. County Atty., Bel Air, Edward H. Hammond, Jr., County Atty., Worcester County, Snow Hill, Barbara M. Cook, County Atty., Howard County, Ellicott City, brief of Counties of Harford, Howard and Worcester for petitioner, amici curiae.

Simon Walton (Schultheis & Walton, P.A., Baltimore), on brief, for respondent.

James K. MacAlister, Baltimore, David M. Kopstein, Seabrook, brief of the Maryland Trial Lawyers Assoc., for respondent, amicus curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

Suzanne Whalen, respondent, who is legally blind, was injured when she fell into a utility hole while her guide dog was doing his business within the legal boundaries of Leone Riverside Park. She filed suit against the Mayor and City Council of Baltimore, petitioner, claiming that Baltimore City, which owns and maintains Leone Riverside Park, was negligent by failing to ensure that the utility hole was safely covered. Petitioner moved for summary judgment and asserted the defenses of governmental immunity, statutory immunity under a recreational use statute, and lack of actual or constructive notice of the danger posed by the uncovered utility hole.[1] The Circuit Court for Baltimore City granted petitioner's motion for summary judgment in an Order dated June 9, 2004. The Court of Special Appeals vacated that judgment. *Whalen v. Mayor & City Council of Baltimore,* 164 Md.App. 292, 883 A.2d 228 (2005). The Mayor and City Council of Baltimore filed a petition for a writ of certiorari, which this Court granted on December 19, 2005. *Baltimore v. Whalen,* 390 Md. 284, 888 A.2d 341 (2005).

The following question is presented for review: "Is a municipality entitled to governmental immunity from a Plaintiff's tort claim that the municipality negligently maintained a public park?" We hold that a municipality is entitled to governmental immunity with respect to tort claims arising from the municipality's alleged negligence in the maintenance of public

---

1. In light of the status of the case and our disposition it is unnecessary to address Baltimore City's last two defenses.

parks when the injury takes place within the boundaries of a public park but outside the boundaries of a public way.

## I. Facts and Procedural History

Respondent came to Baltimore, Maryland, from Texas to attend a meeting at the National Center for the Blind ("NCB"). On February 12, 2000, at approximately noon, respondent took her guide dog into the Leone Riverside Park (the "Park") so that the dog could relieve itself. The Park, which is owned and operated by Baltimore City (the "City"), is located directly across from NCB on Johnson Street.[2] While respondent and her guide dog were making the necessary leash adjustments so that the dog could have room to void,[3] respondent took one step and fell into an "uncovered, cement-

---

**2.** Johnson Street runs north-south. NCB is on the west side of Johnson Street and the Park is on its east side. Thus, to enter the Park, respondent had to exit NCB moving in an easterly direction, cross the sidewalk on the west side of Johnson Street, cross Johnson Street, and cross the sidewalk on the east side of Johnson Street. After crossing the sidewalk on the east side of Johnson Street, respondent crossed over the invisible boundary line that marks both the eastern most edge of the Johnson Street right of way and the western most edge of the Park.

**3.** At her deposition, respondent explained the procedure used when allowing her guide dog to relieve itself:

"First of all, we take the dog's working harness off. When the dog— there are things that the dogs know that they are not allowed to do with their harnesses on. They are not allowed to eat, they're not allowed to relieve, they're not allowed to play. The harness, these dogs have been trained to the idea that harness means work and they are all business, it's like a uniform. So we took the dogs' harnesses off and lengthened the leash, the leash has two lengths, the short length you use when the dog is guiding, the long length you use specifically for relieving, put the dog on the long leash, you give it a command so it knows it's time to relieve, which in my case means [']let's go potty.[']

. . .

"And then you—I can stand for short distances. . . .The dog is on the left, I've got the leash in left hand, I transfer the leash to my right hand and circled him around my body. . . .

. . .

"So he only stays in the radius of my circle. Now, if he wants to take a step or two in any direction to sniff, that's permitted, but it's not like he can just start walking and you go. . . ."

lined pit, approximately 19"x19" and 41" deep." She sustained injuries to her back and ankle and, as a result, was permanently disabled.

On February 11, 2003, respondent filed suit against the City claiming that the City "failed to use reasonable care, in that their agents and/or employees failed to ensure that the abandoned pit or hole immediately adjacent to a public sidewalk, in a grassy are [sic] where the public and their pets could be expected to walk, was securely covered or filled in." [4] On April 13, 2004, after various other motions were filed and discovery was conducted, the City moved for summary judgment on three grounds: 1) as a matter of law, the City was immune from suits arising from the operation and maintenance of public parks; 2) the City did not owe a duty to respondent under Maryland Code (1973, 2000 Repl.Vol.), § 5–1103 of the Natural Resources Article; [5] and 3) there was no evidence that the City had active or constructive notice of the existence of the uncovered utility hole. [6]

---

**4.** Although respondent appears to have filed suit on the last day of the three years, it also appears from the record that she did comply with the Local Government Tort Claims Act, Maryland Code (1973, 2002 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article, provision requiring that notice of the claim be given to the local government within 180 days of the injury by informing the City of the occurrence by letter. Respondent asserts in her brief to this Court that notification took place in "early 2000."

**5.** " **§ 5–1103 Landowner not required to keep premises safe for recreational use.**

 Except as specifically recognized by or provided in § 5–1106 of this subtitle, an owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition, use, structure, or activity on the premises to any person who enters on the land for these purposes."
Maryland Code (1973, 2000 Repl.Vol.), § 5–1103 of the Natural Resources Article.

**6.** As we have indicated, we are not required to address the issue of notice of the defect in the present case. We note, however, that this Court has held that before a municipality may be held liable by an injured member of the public it must have actual or constructive pre-injury notice of the existence of a hazard, even when the hazard is *in a*

In the City's motion for summary judgment and the respondent's opposition, reference was made to a plat prepared by J. Allen Jones of the City's Survey Control Section entitled: "SHOWING THE LOCATION OF A CONCRETE BASE WITH A 1.6 FOOT BY 1.6 FOOT OPENING ON THE WEST SIDE OF RIVERSIDE PARK ACROSS FROM 1746 JOHNSON STREET." In its motion, the City pointed out that the plat confirmed that the "hole is within the park property. The edge of the opening was 3.6 feet east of the [Johnson Street] right of way and well *within the park.*" (Emphasis added). Respondent did not dispute the accuracy of the plat and conceded in its opposition that the "edge of the hole into which the [respondent] fell lies a little more than an arm's length, 42 inches (3.6 feet), beyond the Johnson Street right of way, just marginally *within the boundary of Riverside Park. . . .*" (Emphasis added).

On June 9, 2004, the Circuit Court for Baltimore City heard arguments on the motion for summary judgment and issued an Order that same day granting the City's motion "for the reasons enumerated on the record." [7] It was from this ruling that respondent noted an appeal to the Court of Special Appeals.

In the Court of Special Appeals, the parties were forced to reconstruct the trial court's ruling on the motion for summary judgment from memory and notes due to the lack of a hearing transcript. The parties agreed that the trial court granted the motion for summary judgment on sovereign or governmental immunity grounds and not statutory immunity grounds. The parties were uncertain as to that court's disposition of the notice issue. While the Court of Special Appeals addressed

---

*public way. Weisner v. Mayor and Council of Rockville,* 245 Md. 225, 228, 225 A.2d 648, 650 (1967); *Leonard v. Lee,* 191 Md. 426, 431, 62 A.2d 259, 261, (1948); *Keen v. Mayor and City Council of Havre de Grace,* 93 Md. 34, 39, 48 A. 444, 445 (1901).

7. Unfortunately, there is no transcript of the summary judgment hearing which, presumably, contained the "enumerated" reasons. The court reporter's notes from that hearing were lost and a transcript was never created.

both the issues of governmental immunity and notice, the issue of notice was not presented to this Court.

The Court of Special Appeals restated the issue before it as: "[W]hether the court below erred in deciding, as a matter of law, that because the accident occurred within the Park, the City is automatically protected by governmental immunity." *Whalen*, 164 Md.App. at 297, 883 A.2d at 231. The intermediate appellate court focused a great deal on the proximity of the hole to the sidewalk on the east side of Johnson Street. The court found that:

> "[T]he [circuit] court erred in deciding, as a matter of law, that the City was engaged in a governmental function in connection with the maintenance of the grassy area. While the municipality's duty to maintain the Park is governmental, the City's maintenance of sidewalks, streets, and contiguous areas is a proprietary function. Here, the grassy area adjacent to the sidewalk arguably served a dual purpose; a jury could reasonably conclude that someone on the sidewalk could meander off, without expecting to fall into an open pit."

*Id.* at 324, 883 A.2d at 247. For the reasons stated below, we reverse the judgment of the Court of Special Appeals.

## II. Standard of Review

When reviewing a trial court's grant of summary judgment, an appellate court reviews the decision *de novo. Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385 Md. 99, 106, 867 A.2d 1026, 1030 (2005); *see also Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98, 105 (2004). Before making a determination as to whether the trial court was correct as a matter of law, the appellate court must first determine whether there is a genuine dispute of material fact. *Jurgensen v. New Phoenix Atlantic Condominium Council of Unit Owners*, 380 Md. 106, 114, 843 A.2d 865, 869 (2004). All factual disputes and reasonable inferences drawn from the facts of the case, are resolved in favor of the non-moving party. *Id.* at 114, 843 A.2d at 869. Only when there is an absence of a genuine dispute of material fact, will an appellate

court determine whether the trial court was correct as a matter of law. *Rockwood,* 385 Md. at 106, 867 A.2d at 1030; *Jurgensen,* 380 Md. at 114, 843 A.2d at 869.

### III. Discussion

Petitioner argues that municipalities are not liable in tort for alleged negligence in maintaining public parks because doing so has traditionally been considered a governmental function. Thus, because it is undisputed that the utility hole giving rise to this incident is within the boundaries of the Park, the City contends it is protected by governmental immunity.

Respondent argues that the City is not entitled to governmental immunity because the maintenance of streets, public ways, and the areas contiguous and adjacent to them is a proprietary function of government. Respondent urges this Court to find that the hole in question is contiguous or adjacent to the Johnson Street right of way and as a result, the maintenance of the area where the hole was located falls within the proprietary function of the City. In effect, respondent urges the Court to overlook the fact that the hole is within the boundaries of the Park.

We reiterate that the parties have agreed that the hole is located within the boundaries of the Park and that the hole is not within the boundaries of the Johnson Street right of way. Moreover, the City owns the Park. Thus, there is no dispute of material fact as to where the incident took place and we have only to determine whether the trial court was correct as a matter of law in finding that the City was operating in its governmental capacity and was, therefore, immune to suit.

### A.

"The doctrine of sovereign immunity from suit, rooted in the ancient common law, is firmly embedded in the law of Maryland." *Katz v. Wash. Suburban Sanitary Comm'n,* 284 Md. 503, 507, 397 A.2d 1027, 1030 (1979). In the same year that *Katz* was decided, Judge Orth wrote for the Court:

"The doctrine today is, perhaps, more accurately character-
ized as 'governmental immunity,' for, by judicial decision, it
is not only applicable to the State itself, but also applies
generally to a county of the State and to the State's
municipal political subdivisions and local agencies, unless
the General Assembly either directly or by necessary impli-
cation has waived the immunity. Unlike the total immunity
from tort liability which the State and its agencies possess,
the immunity of counties, municipalities and local agencies is
limited to tortious conduct which occurred in the exercise of
a 'governmental' rather than a 'proprietary' function."

*Austin v. Mayor and City Council of Baltimore,* 286 Md. 51,
53, 405 A.2d 255, 256 (1979) (citations omitted). The distinc-
tion between a governmental function and a proprietary func-
tion is as follows:

"If the neglect or wrongful act was in the course of the
performance of a purely governmental duty which had been
imposed upon the municipality as a governmental or public
agency by legislative enactment, there would be no liability
in tort in favor of an individual who had been injured.

. . .

"If, on the contrary, the power given and the duty en-
joined relate to the local or special interests of the munici-
pality, and be imperative, and not discretionary, legislative,
nor judicial, and the wrongful act is done in the performance
of such a duty, then the act is said to be done in the private
or corporate capacity of the municipality. . . . "

*Mayor and City Council of Baltimore v. Eagers,* 167 Md. 128,
135, 173 A. 56, 59 (1934). Moreover, we have consistently
declined to expand or contract governmental immunity:
"[T]he task of abrogating or altering the doctrine of sovereign
or governmental immunity is one to be performed by the
legislature." *Austin,* 286 Md. at 58, 405 A.2d at 259. The
distinctions which have been made over the years between
governmental functions and proprietary functions are at the
heart of the matter *sub judice.* We have said:

"It is often difficult to determine in a particular instance whether the duty involved is in the exercise or neglect of the municipality's governmental or political functions or of its ministerial and private or corporate functions."

*Eagers,* 167 Md. at 136, 173 A. at 59. We find no such difficulty in the case at bar.

### B.

Petitioner urges that the holding in *Mayor and City Council of Baltimore v. State, ex rel. Ahrens,* 168 Md. 619, 179 A. 169 (1935) and its progeny are dispositive in the present matter. We agree.

In *Ahrens,* the State, on behalf of the parents of William Wallace Ahrens, brought suit against the City alleging that the City's negligence in maintaining Gwynns Falls Park was the cause of the boy's death. On May 21, 1933, young Ahrens, who was ten years old, and some of his friends went to Gwynns Falls, a natural stream flowing through Gwynns Falls Park. The City owned and maintained Gwynns Falls Park. At a place called Twenty Foot Rock, the stream, which was typically rather shallow, dropped off suddenly and reached a depth of 15 to 20 feet. Most of the boys chose to swim in the deeper portion of the stream by the drop-off. Young Ahrens, who could not swim, chose to wade in the shallow water and by accident or by a tragic and youthful error in judgment, ended up in the deep water and drowned.[8]

The *Ahrens* Court began its discussion by reviewing the portion of the Baltimore City Charter which created a Department of Public Parks to manage the public parks belonging to or controlled by the Mayor and the City Council:

"Section 90 of the Charter of Baltimore City creates a department of public parks and squares of the Mayor and City Council of Baltimore, and provides that the head of

---

8. Young Ahrens and his group were accompanied by their Sunday school teacher, Mr. Bailey. He too lost his life while trying to save the drowning boy.

said department shall consist of a board of park commissioners composed of five members; section 91 of said Charter provides that the board of park commissioners shall have charge and control of all public parks, squares, boulevards leading to parks, springs, and monuments belonging to and controlled by or in the custody of the Mayor and City Council of Baltimore. . . ."

168 Md. at 621, 179 A. at 169. The Court then identified the issue as "whether or not the maintenance, control and operation of Gwynns Falls Park, as one of the public parks of Baltimore City, under the authority hereinbefore detailed, is the exercise of a governmental function?" *Id.* at 623, 179 A. at 170. The Court reasoned that:

"[T]o hold municipalities liable in damages, under circumstances such as are revealed in the instant case, would be against public policy, because it would retard the expansion and development of parking systems, in and around our growing cities, and stifle a gratuitous governmental activity vitally necessary to the health, contentment, and happiness of their inhabitants.

"Our conclusion, therefore, is that the maintenance, control, and operation of Gwynns Falls Park, by the appellant, is a governmental duty, discretionary in its nature, performed in its political and governmental capacity as an agency of this State."

*Id.* at 628, 179 A. at 173; *accord Austin v. Mayor and City Council of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979) (holding that even though a nominal fee was charged to participants, Baltimore City was operating in its governmental capacity when a young girl drowned on a trip to Greenbrier State Park as a result of her participation in a day camp operated by the Baltimore City Department of Recreation and Parks); *Mayor and City Council of Baltimore City v. State, ex rel. Blueford,* 173 Md. 267, 195 A. 571 (1937) (holding that the maintenance and management of a public swimming pool in a public park is also a governmental function). Thus, it is the law of this State that a municipality is acting in its governmental capacity when maintaining, controlling, and operating a public park.

Respondent argues that it is irrelevant that the utility hole is within the boundaries of the park because the hole is "contiguous or adjacent" to the public sidewalk within the Johnson Street right of way. In so arguing, she primarily relies upon *Eagers*, which is readily distinguishable from the case at bar.

In *Eagers*, the estate of Eagers brought suit against the City for alleged negligent acts that occurred while City workers were cutting down a tree near the boundary of a public square and a sidewalk. 167 Md. 128, 173 A. 56 (1934). On September 8, 1932, August Eagers was walking in a southerly direction down the center of a public sidewalk which bordered the perimeter of Collington Square in Baltimore City. Nearby, several City workers were attempting to fell a tree which was 20 feet east of the closest edge of the sidewalk. Using ropes and pulleys to accomplish their task, the workers caused one of the tree's rotten limbs, which extended in a westerly direction over the sidewalk upon which Eagers was walking, to break off. The limb, which was about nine inches in diameter and about 20 feet long, fell on Eagers, injuring him. He succumbed to his injuries two days later.

The Court was called upon to decide, in part, whether the cutting down of a tree, which extended approximately 20 feet from a park towards and over a public sidewalk, was a proprietary or governmental function. The *Eagers* Court acknowledged that the case before it concerned the competing interests of the need to maintain a public square [9] and the safety of travelers on a public way. 167 Md. at 136, 173 A. at 59. The Court reasoned that because it was an obligation of a municipality to keep its streets and public ways safe for travel in an ordinary manner, that it was also the duty of the municipality in that instance to prevent its agents and servants from creating a danger *on the public way. Id.* Thus, the City was acting in its proprietary capacity when the workers

---

**9.** The *Eagers* Court did not distinguish between a public square and a public park because the square was operated by Baltimore's "municipal board of park commissioners[.]" 167 Md. at 132, 173 A. at 58.

cut the tree limb that fell onto the sidewalk because the City's actions affected Eagers while he was *actually on the public way.*

The cases cited by the *Eagers* Court in support of its holding, make clear that its scope is limited to acts or omissions by the municipality which may take place outside the bounds of the public way but create actual hazards on the public way. The *Eagers* Court primarily relied on *Mayor and City Council of Havre de Grace v. Fletcher,* 112 Md. 562, 77 A. 114 (1910) and *Mayor and Council of Hagerstown v. Crowl,* 128 Md. 556, 97 A. 544 (1916).

In *Fletcher,* a young girl, who was actually on a paved public way, was injured when a keg of beer, from a stack of kegs which was on or near the sidewalk and eight feet in height, fell on her. The *Fletcher* Court concluded that Havre de Grace was liable for breaching its duty to keep the streets free for use by the public when it did not remove the kegs or order the hotel responsible for the kegs to remove them. 112 Md. at 570, 77 A. at 117. In *Crowl,* a young boy, who was also walking on a paved sidewalk that was part of a public way in front of a building, lost the use of one eye when mortar fell on him from an adjacent construction site. The Court found that Hagerstown was liable for failing to vigorously enforce regulations requiring workers to protect the public from falling debris when they are building in close proximity to public streets. *Crowl,* 128 Md. 556, 97 A. 544. Therefore, the *Eagers, Fletcher,* and *Crowl* holdings are factually inconsistent with those of the case *sub judice.*

*Eagers, Fletcher,* and *Crowl* all stand for the proposition that a municipality may be responsible for protecting individuals who are physically within the bounds of a public way from hazards caused by the governmental entity which may come from outside the boundaries of the public way onto the public way that could have and should have been foreseen and prevented by the governmental agency. None of these cases stand for the proposition that a governmental entity loses its immunity and is liable to a person who leaves a public way and

while not in a public way, encounters a hazard in a public park. Thus, the *Eagers* line of cases, relied upon by respondent, is not analogous to the facts presently before us.

Respondent also cites *Haley v. Mayor and City Council of Baltimore,* 211 Md. 269, 127 A.2d 371 (1956), for support. In that case, two individuals, in unrelated incidents, were injured while walking down steps which were part of a concrete walkway connecting two busy downtown intersections. The upper level intersection was formed by St. Paul Street, Franklin Street, and the Orleans Street viaduct. The lower level intersection was formed by St. Paul Place and Franklin Street. The concrete walkway, of which the steps were a part, traversed a grassy plot which was between and parallel to St. Paul Street and St. Paul Place. The grassy plot and the steps were maintained by Baltimore City's Department of Recreation and Parks.

The issue before the Court was whether the maintenance of the steps was a governmental or proprietary function. The Court held that the maintenance of the steps was a proprietary function because the steps were part of a walk that was a public way that connected two other public ways. *Haley,* 211 Md. at 274, 127 A.2d at 373. In so holding, the Court emphasized the importance of the location of the concrete walk. The walk was actually a public way because it connected two very busy street intersections in the downtown area, *id.* at 272, 127 A.2d at 372, and because "the appellants were using the steps as part of the public highway in order to travel between points which were outside the park and not for recreational purposes." *Id.* at 273, 127 A.2d at 373. In essence, the Court decided that even though the walk was within the boundaries of the park and maintained by the Department of Recreation and Parks, the location of the existing walk, between two busy downtown intersections, required the Court to classify the walk as a public way.

Whatever the remaining viability of *Haley,* in the case at bar, respondent, unlike the individuals involved in *Haley,* was not injured while traveling along an already existing walkway

that connected two busy downtown intersections which were outside the bounds of the park. She was injured when she left one sidewalk, crossed a street, crossed a second sidewalk, and left that sidewalk and entered a public park, with no apparent intent to continue or connect to another public way. Therefore, like *Eagers, Haley* is factually distinguishable from the case before us and the law we applied there is not applicable in this case.

## C.

Turning to the case before us, we next review relevant portions of the Baltimore City Charter. The Charter, in this context, vests the Department of Recreation and Parks with essentially the same powers that it had when *Ahrens* was decided. Except for the powers granted to the Board of Estimates, the executive power of the City is vested in the "Mayor, the departments, commissions and boards provided for in this article...." Baltimore City Charter, Art. VII, § 1(a). Section 65 of the same article establishes a Department of Recreation and Parks and creates the position of Director to run the department. Article VII, § 67 states that the "Director of Recreation and Parks shall have the following powers and duties[,]" and § 67(a) gives the Director the power to "*establish, maintain, operate and control parks,* zoos, squares, athletic and recreational facilities and activities for the people of Baltimore City, and to have charge and control of all such property and activities belonging to, or conducted by, the City[.]" (Emphasis added). Therefore, the obligation of the petitioner to maintain, operate, and control Leone Riverside Park was a governmental duty, discretionary in its nature, and performed in its governmental capacity.

Respondent was not on a public way when she fell into the utility hole. She was within the boundaries of the Leone Riverside Park and the trial court did not err in deciding as a matter of law that the City is immune from suit for the injuries respondent suffered as a result of her fall.

We recall Chief Judge McSherry's timeless admonition:

"But hard cases, it has often been said, almost always make bad law; and hence it is, in the end, far better that the established rules of law should be strictly applied, even though in particular instances serious loss may be thereby inflicted on some individuals, than that by subtle distinctions invented and resorted to solely to escape such consequences, long settled and firmly fixed doctrines should be shaken, questioned, confused or doubted. It is often difficult to resist the influence which a palpable hardship is calculated to exert; but a rigid adherence to fundamental principles at all times and a stern insensibility to the results which an unvarying enforcement of those principles may occasionally entail, are the surest, if not the only, means by which stability and certainty in the administration of the law may be secured. It is for the Legislature by appropriate enactments and not for the Courts by metaphysical refinements to provide a remedy against the happening of hardships which may result from the consistent application of established legal principles."

*Demuth v. Old Town Bank,* 85 Md. 315, 320, 37 A. 266, 266 (1897) (citation omitted).

## IV. Conclusion

We hold that the trial court did not err in finding that the municipality was entitled to governmental immunity with respect to tort claims arising from the municipality's alleged negligence in the maintenance of a public park when the injury occurred within the boundaries of a public park and outside the boundaries of a public way.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Judge HARRELL joins in judgment only.

Concurring Opinion by WILNER, J.

I join the Court's Opinion. As the law now stands, Baltimore City enjoys governmental immunity with respect to its operation and maintenance of public parks in the City, and, for that reason, it may not be held liable for the injury suffered by Ms. Whalen.

I write separately to suggest a legislative review of the governmental/proprietary distinction that apparently crept into our law in 1914, that has been rejected by most other States, and that, at least as applied, makes utterly no sense. Judges Eldridge and Cole laid all of this out in their separate opinions, one concurring and dissenting, the other dissenting, in *Austin v. Mayor and City Council of Baltimore*, 286 Md. 51, 67, 78, 405 A.2d 255, 263, 269 (1979), and there is no need to repeat what they have said. In *Baltimore County v. RTKL*, 380 Md. 670, 689, 846 A.2d 433, 444 (2004), we confirmed what we had earlier said in *Baltimore v. State*, 168 Md. 619, 625, 179 A. 169, 171 (1935), *E. Eyring & Sons v. City of Baltimore*, 253 Md. 380, 382, 252 A.2d 824, 825 (1969), and *Austin v. Mayor and City Council of Baltimore, supra*, 286 Md. at 58–59, 405 A.2d at 259, that "[m]any of the decisions regarding whether a function is governmental or proprietary in nature are confusing and almost impossible to reconcile."

This Court created the distinction. It exists as a matter of common law, and we could, if we chose, abolish it. We have not done so, largely because the county and municipal governments have come to rely on the protection that governmental immunity provides. If we were to abrogate the distinction, we would then have to decide whether to afford immunity for what are now regarded as proprietary functions or abolish immunity for what have been regarded as governmental functions, and, should we opt for the latter, the decision might create fiscal and budgetary problems for local government.

The Legislature has dealt generally with local government immunity through the Local Government Tort Claims Act, in which, subject to certain exceptions and limitations, it has required local governments to compensate victims of tortious

conduct on the part of local government employees. The Legislature has the ability, better than the Court, to examine the issues in a more global and pragmatic manner, and it ought to do so. The distressing point is that, at least on the record before us—in a case that admittedly has not been tried on the merits—it would appear that the City was indeed negligent in allowing a dangerous condition to exist on property that it owns and is required to maintain, and, in my view, its liability should not depend on whether the dangerous condition was within a right-of-way having no visible boundary or 42 inches across that invisible boundary, on level park property.