*Mayor & City Council of Baltimore v. Sanjeev Varghese*, No. 3, September Term, 2025.

**COMMON LAW GOVERNMENTAL IMMUNITY – DESIGN DECISIONS**

Local governments generally enjoy common law immunity only when performing "governmental," as opposed to "proprietary," functions. A local government's discretionary design decisions concerning the erection of a barrier between a vehicular access road and a promenade are governmental functions for which the local government has governmental immunity.

IN THE SUPREME COURT

OF MARYLAND

No. 3

September Term, 2025

_____

MAYOR & CITY COUNCIL OF
BALTIMORE

v.

SANJEEV VARGHESE

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.
Killough, J., concurs and dissents.

_____

Filed: December 23, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Local governments generally enjoy immunity only when performing "governmental," as opposed to "proprietary," functions. *Rios v. Montgomery County*, 386 Md. 104, 124 (2005). Within our longstanding common law governmental immunity framework, this case presents the question of whether a municipality's decisions about infrastructure design are protected by governmental immunity. We hold that ordinarily, and under the facts present in this case, the answer is yes.

Respondent Sanjeev Varghese was injured when he rode his bicycle into a steel cable stretched between two bollards on Pier 5 at Baltimore's Inner Harbor. In an ensuing negligence lawsuit he filed against Petitioner Mayor & City Council of Baltimore, the City argued that it enjoyed both statutory immunity and common law governmental immunity. The Circuit Court for Baltimore City disagreed and allowed the case to go to a jury, which found the City negligent and awarded damages. The Appellate Court of Maryland affirmed.

Before this Court, the City again argues that it is entitled to immunity because Mr. Varghese's claim is based on the design of the barrier with which he collided. The City contends that infrastructure design is a governmental function for which it enjoys immunity. Mr. Varghese, on the other hand, asserts that this is a straightforward negligence case based on the City's failure to fix a known hazard on its property, which is a proprietary function for which immunity is unavailable.

We agree with the City that the premise of Mr. Varghese's claim is the barrier's design, for which the City enjoys governmental immunity. Accordingly, we will reverse the judgment of the Appellate Court.

## BACKGROUND

The property involved in this case is located on Inner Harbor Pier 5, a City-owned pier. The barrier into which Mr. Varghese crashed is situated between a vehicular access road and the Inner Harbor promenade, which is a path accessible to bikers and pedestrians that winds throughout and beyond the Inner Harbor. *See Mayor & City Council of Baltimore v. Wallace*, 492 Md. 349, 355-56 (2025) (describing the Inner Harbor promenade). In 2003, the City granted an easement to the owner of a hotel on the pier to construct the vehicular access road on a strip of the pier leading from Pratt Street to the hotel. The hotel owner hired, and the City approved, a general contractor to install the access road.

The access road, demarcated by gray bricks, runs parallel to the promenade, which is demarcated by red bricks. The access road is bordered on both sides by a barrier formed by a series of bollards strung together with 5/8-inch metal cables, with gaps at pedestrian crossings. The barrier on the west side of the access road runs between the access road and the promenade. In some places, the red bricks of the promenade abut the gray bricks of the access road. In other places—including where Mr. Varghese ran into the barrier—stairs, concrete blocks, and handrails separate the two paths.

The barriers were originally constructed with an unbroken span of steel cable and bollards across the full length of the access road. In 2005, the City, through its

instrumentality the Baltimore Development Corporation ("BDC"),[1] approved a series of changes to the barrier to promote safety, access, and aesthetics. BDC directed that additional bollards be installed to mark pedestrian crossings and that the cables be removed at those crosswalks. BDC also directed that signs warning pedestrians of automobiles be placed on alternate bollards and in other locations. And BDC directed that the steel cables, which it found were not "aesthetically appealing," be painted black.

Twelve years later, in 2017, a man crashed his bicycle into the barrier. In a demand letter to the City, the man asserted that the accident occurred while he was attempting to

---

[1] The City of Baltimore Development Corporation "was clearly established, and is maintained, as an agent or tool of Baltimore City in order to accomplish the City's ends or purposes." *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 334 (2006). It performs "no purely private functions," *id.* at 331, and otherwise acts in a "quintessentially governmental" capacity, including "municipal responsibilities, such as urban renewal, long-term planning, and special zoning administration," *Trs. of Walters Art Gallery, Inc. v. Walters Workers United*, 492 Md. 92, 128 (2025). As we summarized in determining that the BDC is an instrumentality of the City for purposes of the Public Information Act:

> The BDC's Board of Directors, to include the Chairman of the Board, are nominated or appointed by the Mayor of Baltimore; he has the power to remove members of the Board before their four year terms are up; the Mayor also has the power to fill vacancies; the City's Commissioner of the Department of Housing and Community Development and the City's Director of Finance are permanent members of the Board; the BDC receives a substantial portion of its budget from the City; the BDC has a tax exempt status under the Internal Revenue Code; pursuant to the City's contract with the BDC, if it should cease to exist, the City would control the disposition of the BDC's assets; BDC is also authorized to prepare and adopt Urban Renewal Plans, Planned Unit Developments, Industrial Retention Zones, and Free Enterprise Zones which are traditionally governmental functions.

*Carmel Realty*, 395 Md. at 335.

3

avoid another person. He blamed his accident on what he contended was a "barely visible" cable, which had neither "bright colors nor reflectors for visibility[.]"

Approximately ten months later, in October 2018, at dusk, Mr. Varghese was riding his bike on the Inner Harbor promenade to meet a friend for dinner. From Pratt Street, he turned right onto Pier 5, riding along the promenade's red bricks. With the Institute of Marine and Environmental Technology on his left and the U.S. Coast Guard Cutter 37 on his right, Mr. Varghese turned left, veered off the path marked by the red bricks, rode up a set of two stairs located between a handrail and a large concrete block, and crashed into the barrier cable that runs between the access road and the promenade. He suffered injuries. Below is an image, introduced into evidence at trial, of the location where the accident occurred.



Mr. Varghese filed a negligence and premises liability complaint against several defendants. Only the claims against the City are at issue in this appeal.

In his complaint, Mr. Varghese alleged that "the condition of the [p]remises, including but not limited to the" barrier, "created a hazard and an unreasonably dangerous condition." According to Mr. Varghese, the City owed him "a duty to maintain the premises in such condition that the public would not be subjected to risks from the physical state of said premises, and to inspect and correct said dangerous or defective conditions which it knew or by the exercise of reasonable care should have known to have existed."

Throughout the litigation, the City argued that it was entitled to common law governmental immunity because, among other things, the placement and design of the barrier was a discretionary governmental decision. That is, the City contended that this case was not about a "failure to maintain" the barrier, but about choices made in the design of the barrier.

At trial, the parties stipulated that the City had received notice of an alleged defect in the cable in January 2018, referring to the demand letter sent on behalf of the biker who crashed into the barrier in 2017. The Chief of the Maintenance Division of the City's Department of Transportation testified that the barrier serves as a traffic control device on the access road to prevent vehicles from veering off into pedestrians or into the Inner Harbor. He also testified that he did not believe the area where the accident occurred was defective.

Mr. Varghese's civil engineering expert, Jason Boyd, testified that the "bollards and cables located at the incident area are an inherently dangerous and hazardous condition . . . for pedestrians and bicyclists . . . such as Mr. Varghese." In his view, the "location of the bollards and specifically the cables are in a location of [expected[2]] and encouraged traffic for pedestrians and bicycle traffic, and the cable itself is not . . . visible to any kind of bicyclist for sure. It is a hazard, as defined by the industry standard of care." Mr. Boyd also asserted that the handrails on the steps were "visual cues that encourage bicyclists to drive in the location," but that the "path is blocked by this cable." To "properly maintain" the area, Mr. Boyd suggested removing the cables because "they serve no functional purpose." Even if there were a functional purpose, Mr. Boyd recommended additional signage, removal of the "visual cue" handrails, and brighter color cables.

Mr. Boyd explained his understanding about the differences between "design" and "maintenance": "Design is the initial planning for construction; what is intended to be constructed. Maintenance would be maintaining what is constructed, over the course of its lifetime, to a condition equal to or similar as what was intended at the time of construction and for its functionality." However, he noted that maintenance also included "[r]egular inspection," "cleaning," "repairing or correcting issues or damages," and "identifying issues that may be occurring at your facility and making design changes, as necessary

---

[2] According to the transcript, Mr. Boyd used the word "inspected" here. Given the context of the sentence and his similar use of the word "expected" elsewhere in the transcript, we suspect that the use of "inspected" is a transcription error.

to . . . mitigate those issues." Mr. Boyd did not identify any way in which the barrier was in disrepair or inconsistent with its design.

The jury found the City liable and awarded damages. After trial, the City moved for judgment notwithstanding the verdict, once again asserting governmental immunity, among other defenses.[3] The circuit court ultimately rejected the City's immunity contentions.

Before the Appellate Court, the City again argued that it was entitled to common law governmental immunity. The intermediate appellate court disagreed, concluding that Mr. Varghese pursued a case of failure to fix a known hazard of which the City had notice, and that the City was not immune from such a claim. *Mayor & City Council of Baltimore v. Varghese*, No. 720, Sept. Term, 2023, 2024 WL 4297033, at *6 (Md. App. Ct. Sept. 26, 2024).

---

[3] Through much of the litigation, including in post-trial motions and on appeal, the parties focused on two additional arguments. First, the parties disputed whether the location of the accident was in a "park" for purposes of common law immunity. *See Mayor & City Council of Baltimore v. Whalen*, 395 Md. 154, 165 (2006) ("[I]t is the law of this State that a municipality is acting in its governmental capacity when maintaining, controlling, and operating a public park."). That argument is not before us. Second, the parties disputed the "recreational" nature of biking for purposes of immunity under the Maryland Recreational Use Statute, Md. Code Ann., Nat. Res. §§ 5-1101 – 5-1109 (2023 Repl.; 2025 Supp.). The City maintains in this Court that it is immune under the Maryland Recreational Use Statute. Because of our resolution in favor of the City on common law governmental immunity grounds, we do not address the City's statutory immunity contentions.

7

## DISCUSSION

### I. STANDARD OF REVIEW

We review a grant or denial of a motion for judgment notwithstanding the verdict for legal correctness, by "viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented." *Cooper v. Rodriguez*, 443 Md. 680, 706 (2015) (quoting *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011)).

### II. COMMON LAW GOVERNMENTAL IMMUNITY

#### A. Governmental Immunity in Maryland

Immunity allows a defendant to avoid liability in tort, generally conferred based on the "status or position of the favored defendant[.]" *D'Aoust v. Diamond*, 424 Md. 549, 584 (2012) (quoting William L. Prosser, *Handbook of the Law of Torts* 970 (4th ed. 1971)). Immunity "does not deny the tort, but the resulting liability." *Id.* (quoting Prosser, above, at 970). Maryland courts have long recognized counties and the City of Baltimore as favored defendants that enjoy "governmental" immunity. *Austin v. Mayor & City Council of Baltimore*, 286 Md. 51, 53 (1979). "Unlike the total immunity from tort liability which the State and its agencies possess, the immunity of counties . . . is limited to tortious conduct which occurred in the exercise of a 'governmental' rather than a 'proprietary' function." *Id.*

8

The distinction between "governmental" and "proprietary" functions has been developed in our caselaw.  In 1934, this Court described governmental acts as those in "the performance of a purely governmental duty which had been imposed upon the municipality as a governmental or public agency by legislative enactment[.]"  *Mayor & City Council of Baltimore v. Eagers*, 167 Md. 128, 135 (1934).  In that case, "there would be no liability in tort in favor of an individual who had been injured" by the alleged act or omission.  *Id.*; *see also Mayor & City Council of Baltimore v. State ex rel. Blueford*, 173 Md. 267, 276 (1937) ("Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature.").  A proprietary act, on the other hand, is an "imperative" act, "not discretionary, legislative, nor judicial," related "to the local or special interests of the municipality[.]"  *Eagers*, 167 Md. at 135.  Where "the wrongful act is done in the performance of such a duty, then the act is said to be done in the private or corporate capacity of the municipality as distinguished from an act done in its political and governmental capacity as an agency of the state, and the municipality must answer civilly for the negligence."  *Id.*

We recognized in *Eagers*, and have continued to recognize, the inherent difficulty in identifying "whether the duty involved is in the exercise or neglect of the municipality's governmental or political functions or of its ministerial and private or corporate functions."  *Id.* at 136; *see also Baltimore County v. RTKL Assocs.*, 380 Md. 670, 689 (2004) ("Many

9

of the decisions regarding whether a function is governmental or proprietary in nature are confusing and almost impossible to reconcile."); *E. Eyring & Sons Co. v. Mayor & City Council of Baltimore*, 253 Md. 380, 382 (1969) ("The distinction between governmental and proprietary functions is sometimes illusory in practice."); *Mayor & City Council of Baltimore v. State ex rel. Ahrens*, 168 Md. 619, 625 (1935) ("[T]he line of demarcation between private, corporate, and ministerial, and governmental, political, and discretionary activities or functions of municipalities is difficult to discern, and more difficult to define.").

Despite the difficulty and confusion surrounding the governmental-proprietary distinction, we "have consistently declined to expand or contract governmental immunity," *Mayor & City Council of Baltimore v. Whalen*, 395 Md. 154, 163 (2006), on the ground that "the task of abrogating or altering the doctrine of sovereign or governmental immunity is one to be performed by the legislature," *Austin*, 286 Md. at 58; *see also, e.g.*, *Whalen*, 395 Md. at 172 (Wilner, J., concurring) ("The Legislature has the ability, better than the Court, to examine the issues in a more global and pragmatic manner, and it ought to do so.").[4]

---

[4] The historical basis for the governmental-proprietary distinction is explained in Eugene McQuillin's treatise *The Law of Municipal Corporations*. McQuillin explains that "[t]hese distinctions, though elusive to us today, made sense at a time when municipal corporations were seen as almost semi-private associations, chartered by the sovereign, for the purpose of providing local inhabitants with services that no government had previously performed. Courts started talking about the 'dual nature' of local governments—part public or governmental, and part 'corporate' or 'proprietary.'" *See* Eugene McQuillin, *The Law of Municipal Corporations* § 53:6 (3d ed. 2021). Recognizing that immunity attached

While Maryland has maintained its governmental immunity standard, some other states have abandoned or significantly altered theirs. *See Owen v. City of Independence*, 445 U.S. 622, 645-46 n.28 (1980) (observing that the "opinion of the Florida Supreme Court in *Hargrove v. Town of Cocoa Beach*, 96 So.2d 130 (1957), has spawned a minor avalanche of decisions repudiating municipal immunity, which, in conjunction with legislative abrogation of sovereign immunity, has resulted in the consequence that only a handful of States still cling to the old common-law rule of immunity for governmental functions" (citation and quotation marks omitted)). But "even states that completely abolished sovereign immunity generally grant immunity for policy decisions or discretionary actions out of constitutional concerns over judicial interference with other

only to governmental acts, "courts tried to distinguish between harms resulting from municipalities' governmental functions and harms resulting from their proprietary functions." *Id.*

The reason that the distinction, as it has been applied, may now appear "unsound[]" and "illogical," *see Austin*, 286 Md. at 72 (Eldridge, J. concurring in part and dissenting in part), likely lies in the substantial increase in functions that today are viewed as core governmental responsibilities, which previously were viewed as proprietary, *see, e.g., id.* ("I can think of no reason whatsoever why the operation of a park, swimming pool or camp should be deemed 'governmental,' thereby relieving the City of liability for its negligence, whereas the construction and maintenance of public streets, bridges and sewers, or the removal of garbage, or the supplying of water to homes, should all be classified as 'proprietary' with governmental liability for negligence. In light of the concern for the public health and the environment, the latter group of activities are just as important government functions as the former, if not more so. There simply is no rational basis for this classification of the operations of local government."). Of course, if we were to attempt to realign the doctrine of governmental immunity to classify as governmental all activities that are now commonly viewed as core functions of municipal government, we would grant immunity to municipalities for substantially more conduct than has been the case under the common law for the last century. Any such change should be initiated by the General Assembly, not this Court.

11

branches of government."[5] Eugene McQuillin, *The Law of Municipal Corporations* § 53:6 (3d ed. 2021) (citing *Owen*, 445 U.S. at 640 (quoting, in turn, the McQuillin treatise)).

McQuillin provides two relevant rationales for this preservation of immunity for discretionary actions. First, "courts should not pass judgment on policies and decisions of the other branches of government." *Id.* § 53:18. "The purpose of the discretionary function exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* § 53:15. Second, "negligence does not provide an adequate framework with which to analyze certain government actions where the real questions are not due care or reasonableness, but social wisdom, political practicability, and economic expediency." *Id.* § 53:18.

Those rationales for immunizing discretionary acts of municipalities were reflected in our decision in *Mayor & City Council of City of Cumberland v. Turney*, involving a plaintiff who was injured in a car accident on a street with a history of many accidents. 177 Md. 297, 303-04 (1939). The plaintiff complained about the construction, surfacing materials, and lighting of the road, and presented testimony that "accidents happened 'every week, practically, sometimes several a week.'" *Id.* At trial, however, engineers

---

[5] Before this Court, the City also argues that second guessing a municipality's design decisions would judicially usurp the role of the other branches such that it would violate Article 8 of the Declaration of Rights, the separation of powers provision of the Maryland Constitution. Given our resolution in the City's favor based on governmental immunity, we do not reach that argument.

testified that, at the direction of the municipality, the road was designed and constructed according to then-prevailing industry standards. *Id.* at 304-06. According to the engineers, "there were no structural defects" on that stretch of the road. *Id.* at 304.

Despite the prior accidents, this Court concluded that the street design and material selection issues were "matters committed to the judgment and discretion" of the municipality. *Id.* at 307. In doing so, the Court observed that "[t]he principle that a municipality, which has been granted the means to do so, is under a duty to keep the public streets and highways, under its management and control, in a reasonably safe condition, is too firmly established in this state to require either argument or authority." *Id.* The Court noted, however, that prior cases implementing that principle involved different circumstances, such as municipal inaction in the face of "a limb of a tree falling in a public road," "a hole in a sidewalk," "a trench in a pavement," "ice on a sidewalk," and "a stump in a roadway." *Id.* at 307-08. But "[i]n none of those cases did the court approve the principle that a municipality is subject to liability for injuries resulting from erroneous but honest exercise of the judgment and discretion reposed by the law in its administrative officials." *Id.* at 309.

The Court also highlighted and restated the basic tort principle that negligence cannot "be inferred from the mere fact that a road or street is unsafe[.]" *Id.* In other words, that someone was injured does not necessarily mean that someone was negligent. *See id.* at 310 ("In such a case there may obviously be danger without negligence[.]").

13

After discussing treatises and caselaw from other jurisdictions,[6] we concluded that although "there is no uniformity in the decisions on any phase of the question," the "better rule" is "that a municipality is not liable for an injury resulting from an error of judgment, unaffected by negligence, in the formulation and adoption of plans for the construction or improvement of a highway, unless the condition which caused the injury is so obviously dangerous that there could be no room for difference in the minds of [people] of ordinary judgment and intelligence as to its dangerous character." *Id.* at 314.

## B. Analogous Reasoning in Federal Caselaw

Federal courts applying the Federal Tort Claims Act undertake a similar analysis, albeit employing somewhat different terminology. In the Federal Tort Claims Act, Congress effected a limited waiver of the United States's sovereign immunity but carved

---

[6] In *Turney*, we found particularly persuasive the decision of the New York Court of Appeals in *Urquhart v. City of Ogdensburg*, 91 N.Y. 67 (1883). *Turney*, 177 Md. at 313. In *Urquhart*, as we recounted in *Turney*, the plaintiff was injured "on an icy sloping sidewalk" and argued that the slope was constructed "too steep." *Id.* Finding error in the trial court's refusal to enter a nonsuit, the court held that "[i]t is very plain, [that] the city could not be held liable for a defect or error in the plan" for the sidewalk. *Id.* (quoting *Urquhart*, 91 N.Y. at 72).

New York continues to recognize common law governmental function immunity. *See Valdez v. City of New York*, 960 N.E.2d 356, 361-62 (N.Y. 2011) ("Although the State long ago waived sovereign immunity on behalf of itself and its municipal subdivisions, the common-law doctrine of governmental immunity continues to shield public entities from liability for discretionary actions taken during the performance of governmental functions. . . . This limitation on liability reflects separation of powers principles and is intended to ensure that public servants are free to exercise their decision-making authority without interference from the courts.").

14

out an exception for discretionary acts. We have recognized, albeit in a different context,[7] that "'discretionary' activities of a governmental entity under the [Federal Tort Claims Act] constitute 'governmental' activities within the meaning of the 'governmental/proprietary' test." *Tinsley v. Washington Metro. Area Transit Auth.*, 429 Md. 217, 235 (2012) (quoting *Smith v. Washington Metro. Area Transit Auth.*, 290 F.3d 201, 206-07 (4th Cir. 2002)).

In *Bowman v. United States*, the United States Court of Appeals for the Fourth Circuit held that the government's decision to not install a guardrail or warnings on a road was discretionary, and thus immune from a negligence suit after a car slid off the road. 820

---

[7] That different context is the scope of immunity of the Washington Metropolitan Area Transit Authority ("WMATA") under the WMATA Compact. "The WMATA Compact is an interstate agreement among Maryland, Virginia, and the District of Columbia to create an interstate entity responsible for overseeing a mass transportation system in and around the District of Columbia." *Tinsley v. Washington Metro. Area Transit Auth.*, 429 Md. 217, 222 (2012). Under the Compact, WMATA has waived its sovereign immunity for proprietary functions and retained it for governmental functions. *Id.* at 224; Md. Code Ann., Transp. § 10-204(80)(a) (2020 Repl.) ("[WMATA] shall be liable . . . for its torts . . . committed in the conduct of any proprietary function . . . but shall not be liable for any torts occurring in the performance of a governmental function."). To make the proprietary versus governmental determination, the test is "whether the challenged activity involves an element of discretion or choice that is 'grounded in social, economic, and political policy.'" *Tinsley*, 429 Md. at 224 (quoting *Berkovitz v. United States*, 486 U.S. 531, 537 (1988)). Relevant here, we recognized in *Tinsley* that any activity "that is classified as 'discretionary' under the Federal Tort Claims Act test would also be 'governmental' under the Compact." *Id.* at 235. In *Tinsley*, we thus looked to cases analyzing the Federal Tort Claims Act to interpret the proprietary versus governmental distinction. *See id.* at 236-39.

We recognize that, in another case, we "decline[d] to apply" *Tinsley*'s WMATA governmental versus proprietary analysis to the Local Government Tort Claims Act governmental versus proprietary analysis. *See Ellis v. Housing Auth. of Baltimore City*, 436 Md. 331, 357 n.14 (2013). In that case, we concluded that the activity at issue, operating public housing, was governmental for other reasons. *Id.* at 356-57.

F.2d 1393, 1395 (4th Cir. 1987). The Fourth Circuit observed that "National Park Service officials have more than safety in mind in determining the design and use of man-made objects such as guardrails and signs along the Parkway. These decisions require balancing many factors: safety, aesthetics, environmental impact and available financial resources." *Id.* Whether the decision to not install barriers "grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three is not known[,]" but what was "obvious" to the court was "that the decision was the result of a policy judgment." *Id.* The court recognized that it could be argued "that another policy, which places greater emphasis upon safety, is more desirable. However, by the discretionary function exception, Congress intended to prevent courts from second-guessing federal policy." *Id.*

In *Baum v. United States*, the plaintiffs alleged that the National Park Service was liable for both (1) negligent design and construction of the guardrail, and (2) negligent maintenance of the guardrail system. 986 F.2d 716, 718, 722-23 (4th Cir. 1993). As to the design and construction claim, the plaintiffs argued that the choice to use cast iron posts in the construction of the guardrails "fell below an objective standard of reasonableness[.]" *Id.* at 721. The court made short work of that claim, holding that the "question of what materials to use in such a project is . . . fundamentally described as a question of how to allocate limited resources among competing needs." *Id.* at 722. It therefore refused to second guess the Park Service's decision because it "plainly was one bound up in economic and political policy considerations." *Id.*

16

As for the purported "maintenance" claim, the court saw that as an attempt to bring the same design and construction claim using different terminology. *Id.* at 723 n.3. The plaintiffs did not allege any deterioration of the guardrails or other defect in maintenance. *Id.* Instead, their argument was that the cast iron posts "should not have been used in the first place. Thus, there is really no question as to maintenance[;] the fault, if any, was in design and construction." *Id.* In other words, despite the plaintiffs' "allegation of negligence in what they call the 'maintenance' of the guardrail system, nowhere" did they suggest "that the allegedly defective condition of the guardrail system could have been remedied by any action short of outright *replacement* of the cast iron posts." *Id.* at 723. That claim also fell under the exception to the Federal Tort Claims Act for discretionary acts. *Id.*; *see also Mitchell v. United States*, 225 F.3d 361, 364 (3d Cir. 2000) ("The [National Park] Service's choice to focus on a few highly dangerous portions of the road rather than to distribute its finite resources along the whole of [the road] is a policy choice this court should not second-guess."); *Rich v. United States*, 119 F.3d 447, 451-52 (6th Cir. 1997) (discussing and adopting the *Baum* discretionary function analysis); *Terbush v. United States*, 516 F.3d 1125, 1131 (9th Cir. 2008) ("Our case law teaches . . . that design matters involve discretionary decisions by government actors."); *Zumwalt v. United States*, 928 F.2d 951, 956 (10th Cir. 1991) (employing a similar analysis regarding a lack of railing on a park footpath).

17

## C. The City Is Entitled to Governmental Immunity

Here, as in *Turney*, Mr. Varghese has taken issue with a discretionary design decision of the City. Notably, Mr. Varghese has not identified any negligent act by the City in failing to maintain the barrier. He also identified no "error of judgment, unaffected by negligence, in the formulation and adoption of plans for the construction" of the barrier. *See Turney*, 177 Md. at 314. In his complaint, Mr. Varghese states that the barrier itself "created a hazard and an unreasonably dangerous condition," a condition about which the City knew and, in his view, had a duty to correct. At trial, Mr. Varghese's expert similarly opined that the barrier itself was the hazard. To "properly maintain" the area, the expert suggested removal of the barrier or, in the alternative, the use of added signage, pavement markers, or cables of a different color. And although he at one point defined maintenance broadly enough to encompass "making design choices" necessary to mitigate identified issues, recasting a design decision in the language of maintenance does not alter the scope of the City's immunity. *See Baum*, 986 F.2d at 723 n.3.

Throughout this litigation, the City has argued that the design of the bollard-and-cable barrier system was a result of a balancing of the needs of safety, accessibility, and aesthetics. It intended to protect pedestrians from vehicles on the access road, while also allowing them to cross that road at certain points, using a device that did not detract greatly from the enjoyment of those using the area for recreation. To be sure, the City could have made different decisions with a greater emphasis on safety. But its discretionary decision

18

is entitled to judicial deference under our longstanding governmental immunity framework.

Today, we reaffirm that a municipality's discretionary decisions regarding placement and design of infrastructure are governmental acts for which the municipality is ordinarily immune. We also reaffirm the exception to that principle laid out in *Turney*, allowing the possibility for liability where "the condition which caused the injury is so obviously dangerous that there could be no room for difference in the minds of [people] of ordinary judgment and intelligence as to its dangerous character." 177 Md. at 314. Here, that standard is not met. The barrier is located in the Inner Harbor of Baltimore, an area that is heavily trafficked by locals and tourists alike. And yet there was no evidence presented in this case that, following the changes mandated by the BDC in 2005, the safety of the barrier was questioned or that anyone was injured in connection with it for more than a decade.

We will briefly address three additional arguments made by Mr. Varghese. First, in response to the City's argument that his claim is fundamentally premised on a City design choice, Mr. Varghese provides an alternative framing. In his view, the question is "whether the City's duty to respond to a known hazard on a paved public way was proprietary or governmental." But Mr. Varghese's labeling of the barrier itself as a hazard does not control the character of his claim. Nor does his characterization of the City's decision not to alter the barrier after the first cyclist crashed into it make the decision a "maintenance"

19

decision.[8] The evidence at trial did not identify any way in which the barrier was in disrepair or in need of maintenance to function exactly as it is intended to function. Mr. Varghese's claim was based on the design of the barrier, not its maintenance.

Second, Mr. Varghese contends that the City can be held liable for his injuries because the City had notice of the hazard based on the earlier accident. But his "notice" argument is misplaced. The requirement that a local government have prior notice of a hazard before it may be held liable for not addressing it derives from caselaw concerning the proprietary function of maintaining public roadways. In a proprietary case, "before a municipality may be held liable by an injured member of the public it must have actual or constructive pre-injury notice of the existence of a hazard, even when the hazard is *in a public way*." *Whalen*, 395 Md. at 159 n.6. When a municipality is operating in a governmental, not a proprietary, capacity, notice does not overcome immunity. *See, e.g.*, *Turney*, 177 Md. at 314 (finding governmental immunity despite known prior accidents on the road). In other words, notice of an alleged defect in a condition created through the exercise of a governmental function does not transform the nature of that function into a proprietary one.

Finally, Mr. Varghese contends that the City should not gain the benefit of having made a discretionary design choice concerning the barrier because the City itself had no

---

[8] Notably, unlike Mr. Varghese, the first cyclist claimed to have run into the barrier while attempting to avoid another person, presumably reacting quickly while attempting to avoid a different potential crash.

20

role in the design or construction of the barrier. However, the record is clear that, at least as it relates to the claim currently before us, the design and construction of the barrier was reviewed, altered, and eventually approved by BDC, an instrumentality of the City. *See* discussion above in note 1.

## CONCLUSION

Applying our longstanding governmental immunity framework, the City's discretionary design decisions concerning the erection of a barrier between a vehicular access road and a promenade are governmental functions for which the City has governmental immunity.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED; CASE REMANDED TO THE APPELLATE COURT WITH INSTRUCTIONS TO REMAND TO THE CIRCUIT COURT FOR ENTRY OF JUDGMENT IN FAVOR OF PETITIONER. COSTS IN THE APPELLATE COURT OF MARYLAND AND THIS COURT TO BE PAID BY RESPONDENT.**

IN THE SUPREME COURT

OF MARYLAND

No. 3

September Term, 2025

_____

MAYOR & CITY COUNCIL OF
BALTIMORE

v.

SANJEEV VARGHESE

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Concurring & Dissenting Opinion by Killough,
J.

_____

Filed: December 23, 2025

Respectfully, I concur in part and dissent in part. I agree with the Court's judgment reversing the Appellate Court's decision, which misapplied our longstanding immunity framework governing municipal discretionary design decisions. I write separately for two reasons. *First*, to clarify an issue implicated by the parties' arguments and the record: there are limited circumstances under which a municipality owes a duty to warn when an alleged hazard arises from an installed feature of public infrastructure. *Second*, to explain why the appropriate mandate in this case is to reverse the judgment below and remand for a new trial, rather than to enter judgment in favor of the City.

I agree with the Majority's careful account of municipal design immunity and the separation-of-powers concerns that counsel deference to planning judgments. But this case was tried and submitted to the jury largely as a failure-to-warn/maintenance case. The complaint, the trial evidence, and the jury instructions focused on the City's alleged failure to warn the public about a known visibility problem with the cable barrier. Once the case proceeded on that theory, the trial court was required to instruct the jury on the narrow circumstances in which a municipality owes a duty to warn when the alleged hazard arises from an installed design feature.

Maryland law distinguishes ministerial operational duties such as inspection, repair, and warning from discretionary planning and design decisions, which are ordinarily immune subject to narrow exceptions. *See Mayor & City Council of Cumberland v. Turney*, 177 Md. 297, 309–12, 314 (1939); *Rios v. Montgomery County*, 386 Md. 104, 124

2

(2005). Consistent with that distinction, a municipality generally has no duty to post warnings solely because a hazardous condition is part of an open and obvious infrastructure design. *See Roth v. Highways Comm'n*, 115 Md. 469, 477 (1911) (duty to keep public highways safe arises when the danger is "of an unusual character"); *see also Turney*, 177 Md. at 319 (municipality is "under no duty" to keep roads and streets "absolutely safe").

This is not to say that municipal design decisions are categorically immune from liability. Maryland law has long recognized limits on design immunity. *See, e.g., Turney*, 177 Md. at 314; *County Comm'rs of Carroll Cnty. v. Staubitz*, 231 Md. 309, 316–18 (1963); *Gordon v. Howard Cnty.*, 13 Md. App. 42, 48 (1971) (citing *Staubitz*); *Mayor & City Council of Baltimore v. Seidel*, 44 Md. App. 465, 475 (1980). Notably, *Turney* recognizes design immunity for discretionary design decisions unless the condition is so obviously dangerous that reasonable minds could not differ. *See Turney*, 177 Md. at 314. Moreover, a duty to warn of a design feature arises where the municipality knows or should have known that the feature presents a hazardous condition that is "extraordinary or unusual" under the circumstances. *Staubitz*, 231 Md. at 317–18. These limiting principles balance the public's protection against unusual hazards with the need to avoid converting every design judgment into a source of ordinary tort liability. Today's holding should be read within those established limits.

In this case, the jury was instructed only in general negligence terms—that the City owed a duty to keep public ways reasonably safe and to warn of known dangerous conditions—and was not given a limiting instruction derived from *Staubitz* that delineates when a municipal duty to warn attaches with respect to an installed feature. That omission

3

was not harmless. The trial record featured competing narratives: a prior 2017 bicycle crash and a demand letter asserting the cable was "barely visible." Testimony established the barrier as an approved element of the Pier 5 configuration and as a traffic-control device separating the access road from the promenade. The record also shows stairs, a concrete block and handrails at the site that, according to the plaintiff's expert, operate as "visual cues" channeling pedestrians and bicyclists into the cable's alignment. The expert's testimony addressed both visibility and possible remedial measures. On such a contested factual record, an instruction framing the precise threshold for imposing a municipal duty to warn—i.e., that warnings are required only when the condition is extraordinary or not an open and obvious component of the design—was essential.

I agree that this legal error requires reversal. I dissent, however, from the decision to grant judgment to the City as a matter of law on design-immunity grounds. The record contains genuine disputes of material fact regarding whether the cable-and-bollard configuration on the stairway presented an "obviously dangerous" condition or an "extraordinary or unusual" hazard requiring a warning. Those determinations depend on contested evidence concerning visibility, prior incidents, surrounding conditions, and the manner in which the site functioned for foreseeable users. Where, as here, the record supports competing inferences, that standard is not satisfied as a matter of law. Because the trial court failed to give the legally required limiting instruction with respect to the City's duty to warn and because that omission may have affected the verdict on this contested record, the appropriate remedy is reversal and remand for a new trial.

4

A remand preserves the jury's fact-finding role and ensures that any liability is assessed under the narrow legal framework that distinguishes protected discretionary design decisions from a municipality's ministerial duties, including the limited duty to warn of extraordinary or non-obvious hazards. Accordingly, while I join the Court's judgment recognizing that municipal design discretion ordinarily enjoys immunity, I would rest the disposition on the alternative ground that the jury was not instructed on the limited circumstances under which a municipality must post warnings concerning an installed design feature.

For the above reasons, I respectfully concur in part and dissent in part.